290 N.J. Super. 252 (1996)
675 A.2d 684
PAMELA WOODS-PIROZZI, PLAINTIFF-APPELLANT,
v.
NABISCO FOODS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted February 15, 1996.
Decided May 16, 1996.
*259 Before Judges STERN, WALLACE and NEWMAN.
*260 Joseph A. Ferriero, attorney for plaintiff (Mr. Ferriero, of counsel; Mitchell L. Pascual, on the brief).
Grotta, Glassman & Hoffman, attorneys for defendant (Jed L. Marcus, of counsel; Mr. Marcus and Michael T. Bissinger, on the brief).
The opinion of the court was delivered by NEWMAN, J.A.D.
Plaintiff Pamela Woods-Pirozzi (Pirozzi) appeals from the grant of summary judgment dismissing her claims under New Jersey's Law Against Discrimination (LAD) of hostile work environment sexual harassment, retaliation, and constructive discharge. We affirm in part and reverse and remand in part.
The facts are summarized "in the light most favorable to the non-moving party," plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). In September 1989, Pirozzi, then 33-years-old, was hired by Nabisco to be the head nurse/medical supervisor at its Fair Lawn, New Jersey facility. Her supervisor was Mark Matwick, then Safety Coordinator-Employee Relations Supervisor of the facility. Pirozzi's duties included performing first aid, overseeing the Medical Department, handling OSHA logs, and dealing with the workers' compensation insurance company. At her interview, Matwick informed Pirozzi that Nabisco was eventually going to merge the medical and safety departments.
In October 1989, Matwick told Pirozzi that the plant manager, Tom Westin, had not really wanted to hire Pirozzi because he was afraid that, since she was a divorcee with good looks, she would only be looking "for a husband or to get laid."
In January 1990, Stephen Montalto replaced Matwick as Employee Relations Manager and as Pirozzi's supervisor. Montalto reported to John Geso, Personnel Manager. Matwick remained Safety Coordinator.
*261 At some point in time, Ted Klasnick, a hospital's insurance agent, called plaintiff and told her that Ted Wimberly, a union representative employed by Nabisco, had told Klasnick that the way plaintiff was handling the union complaints, she must have been giving Klasnick sexual favors. When plaintiff brought this to the attention of Montalto and Geso, they asked her not to do anything because they were having enough union problems.
In 1990 and 1991, Pirozzi had continuing work-related disagreements with Dr. Stephen Ferraro, who provided medical services for employees at the Fair Lawn facility. In her deposition, Pirozzi conceded that Dr. Ferraro was an independent contractor, not a Nabisco employee.
In February or March 1990, Dr. Ferraro examined a female employee's vagina with no gloves on. Finding Dr. Ferraro's conduct inappropriate, Pirozzi initiated a meeting with Montalto, Matwick, and Dr. Ferraro. At the meeting, an angered Dr. Ferraro asserted that Pirozzi had left St. Joseph's Hospital, her previous employer, because she was "doing" all the residents. Neither Montalto nor Matwick responded to this comment.
In May 1990, Matwick transferred to another Nabisco facility. Pirozzi asked Montalto whether she could be considered for the Safety Specialist position Matwick vacated. Montalto explained that she was not qualified for the position, which Pirozzi acknowledged. In September 1990, Greg Cahill was hired to replace Matwick as Safety Specialist. He reported to Montalto, as did Pirozzi. Cahill had previously worked for UPS training employees regarding job safety and completion of OSHA logs. Pirozzi asserts that, when she asked why she was not interviewed for the position after performing it effectively for the five months since Matwick left, Montalto told her that it was "because you're a woman and a pain in my ass." Pirozzi asserts that Montalto frequently told her that this was why he did not want to give her Cahill's job.
From the end of 1990 through October 1991, Montalto would frequently, about once or twice a week, "humorously walk in *262 [Pirozzi's] office, and bang on [her] door and go, `Good morning loser,'" even after she repeatedly asked him to stop. Pirozzi complained about this, but no action was taken. In addition, Montalto would ask her if she "got lucky last night." Pirozzi also alleges that Montalto made derogatory comments regarding her appearance, such as her nails and hair, and that when an employee was referred to a Dr. Massingil, Montalto stated, "That's a douche, isn't it? Come on Pam, you probably use Summer's Eve."
In January 1991, Plant Manager Terry O'Day sent two memos to all supervisors and managers entitled "Guidelines Regarding Sexual Harassment."
In 1991, Montalto sat on Pirozzi's desk and repeatedly threw a softball over her head (such that it whisked her hair) against a wall with moderate speed from a few feet away. When Pirozzi said, "Steve, please stop that because you may hit me," Montalto responded, "If I choose to hit you, I will."
In September 1990 or January 1991, Dr. Ferraro commented to Pirozzi that she was getting a lot done in the Medical Department and that it obviously was related to sleeping with someone. She complained to Montalto, who took no action. Dr. Ferraro also made a statement that plaintiff was having a sexual affair with Nabisco's orthopedic consultant, Dr. Shmause, and that was the only reason they were using him. Pirozzi reported this to Montalto, who laughed, asked Pirozzi if she was in fact having such an affair, and took no action.
In February 1991, Pirozzi met with Montalto to discuss their differences. Montalto said, "You're so emotional, it must be PMS time." Finding his comment inappropriate, Pirozzi requested a meeting with Geso. Montalto stormed after Pirozzi, screaming, "You and I will settle this, not [Geso]." Geso's decision was that the two needed to work out their problem. Pirozzi asserts that Montalto frequently, maybe twice a month, made comments about her being emotional because of PMS.
*263 In approximately March 1991, an 85-year-old security guard at the Nabisco facility asked Pirozzi's advice on whether he should get a penile implant. The guard put his arms around Pirozzi and said, "If I get [a penile implant], will you do me?" Pirozzi stated that she did not take the guard seriously, but complained to Montalto. Montalto laughed and took no action.
In March 1991, at a meeting between Pirozzi, Dr. Ferraro, Geso, Montalto, and O'Day regarding the working relationship between Pirozzi and Dr. Ferraro, Dr. Ferraro claimed that Matwick was transferred because he was having a sexual affair with Pirozzi. Dr. Ferraro also stated something to the effect of "we all know why Pam was hired, that it wasn't for her qualifications, but for her looks." Montalto and Geso both told Dr. Ferraro that his comment was inappropriate and untrue.
Subsequently, plaintiff met with Angela Garcia, Nabisco's EEO Coordinator, who relayed plaintiff's concerns regarding Dr. Ferraro to Geso. Geso told plaintiff that he knew Dr. Ferraro was "difficult" and they had been trying to get rid of him for years, but she would have to work with him for a while.
After seeing Garcia, plaintiff received Nabisco's policy statement regarding sexual harassment. It set forth the procedures to complain of sexual harassment: (1) the employee should report the matter to her supervisor or to Geso; (2) Garcia would investigate; (3) Garcia or Geso would meet with the complaining employee to discuss the results of the investigation; and (4) after exhausting the above steps, the employee could call Jim Maniatis, Employee Relations Manager. Retaliation against an employee for registering a complaint was prohibited. In May 1991, all employees received a copy of Nabisco's Equal Employment Opportunity manual which prohibited sexual harassment.
On June 12, 1991, plaintiff came down with the measles and did not return to work until August 26, 1991. While plaintiff was hospitalized with the measles, Dr. Ferraro, without authorization, went to the hospital and looked at plaintiff's hospital file. Dr. Ferraro then implied to a Nabisco employee that plaintiff had the *264 AIDS virus, which she did not. Plaintiff complained about this to her supervisors, but nothing was done.
In June 1991, according to Geso and Montalto, Dr. Ferraro's contract with Nabisco was "terminated" in part because of his comment to Pirozzi at the March 1991 meeting.
On July 25, 1991, Pirozzi filed a charge with the New Jersey Division on Civil Rights (NJDCR) alleging sexual harassment by Dr. Ferraro. On August 16, 1991, plaintiff filed a similar Equal Employment Opportunity Commission (EEOC) charge. Geso then called plaintiff at home and asked her if she would drop the charges since Dr. Ferraro had been fired. She refused.
On August 22, 1991, Geso distributed a memo to all employees announcing that "Greg Cahill will have the responsibility of overseeing the functioning of the Medical Department." Cahill replaced Montalto as plaintiff's supervisor. Montalto described the action as an elevation of the Safety Specialist position such that it would report directly to Geso, rather than as previously to Montalto who in turn reported to Geso. The other, related part of the action was giving Cahill supervision of the Medical Department because of Nabisco's concern over rising compensation costs and because "it was more of a logical fit." After this action, according to Montalto, he would not have any reason to deal with Pirozzi since he was no longer her supervisor unless there were employee relations issues involved (since he was still Employee Relations Manager). According to Montalto, Pirozzi was not lowered on the organizational chart since she was still two rungs under Geso, having reported to Montalto who reported to Geso and now reporting to Cahill who reported to Geso.
On August 26, 1991, plaintiff returned to work from her medical leave and found the August 22 memo on her desk. She contends that Cahill was "promoted" and that she was "demoted" in retaliation for her filing NJDCR and EEOC complaints. She bases this assertion on the fact that, whereas previously she worked side-by-side with Cahill, now he was her supervisor. In addition, she no longer had the same responsibilities. Cahill assumed plaintiff's *265 previous duties of dealing with the insurance companies and doing the OSHA logs. When she asked Montalto what her job duties were, he said to just do first aid and laughed, saying, "It's simple, you're a nurse." Her previous duties had been broader. Pirozzi admits that no one ever said she was being demoted as retaliation, but asserts that Montalto made his frequent comment about not giving her Cahill's job "because you're a woman and a pain in my ass" after Cahill's "promotion."
In September 1991, plaintiff met with Geso, who asked her if she would drop her EEOC complaint to ease relations. Geso said that he did not know what she wanted now that Dr. Ferraro was gone. He told her that "I don't know if you know what you're getting yourself into by doing this."
Due to various physical ailments, Pirozzi took a medical leave of absence beginning in October 1991. Nabisco paid 100% of her salary as short-term disability through November 1991, then 66% of her salary as long-term disability through April 1992.
After April 1992, Pirozzi was still technically employed by Nabisco but remained at home, though she no longer had substantial physical problems. Pirozzi resigned in December 1992, effective in January 1993. She stated that she did not resign between October 1991 and April 1992 because her attorney (for a workers' compensation action against her prior employer) advised her to just stay on disability. However, Pirozzi also stated that she would not have returned to Nabisco, even if her doctor and attorney had said that it was all right to, because of the stress and "situation of the job." Between April 1992 and December 1992, Pirozzi did not quit Nabisco and get a new job because her lawyer advised her not to. She ultimately decided to resign on the advice of her attorney and because of the stress of what she had dealt with at Nabisco.
In March 1993, Pirozzi filed a complaint which included the following three claims: (1) hostile work environment sexual harassment under the LAD; (2) retaliation (in violation of the LAD) against plaintiff for filing an EEOC charge, by promoting *266 Cahill; and (3) constructive discharge because the sexual harassment caused her to resign. Pirozzi demanded a jury trial and the following relief: (1) reinstatement; (2) back pay; (3) compensatory damages; and (4) punitive damages.
On April 5, 1995, the motion judge granted Nabisco's motion for summary judgment, dismissing plaintiff's complaint.

I
Plaintiff contends that the motion judge erred in granting summary judgment dismissing her sexual harassment claim.
The Law Against Discrimination (LAD) provides that
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the ... sex ... of any individual, to ... discharge ..., unless justified by lawful considerations ..., from employment such individual or to discriminate against such individual in ... terms, conditions or privileges of employment.... [N.J.S.A. 10:5-12(a).]
In Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993), our Supreme Court established that, to state a cause of action for "hostile work environment" sexual harassment, a female plaintiff must allege conduct which (1) would not have occurred but for her gender; and was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) her working environment is hostile, abusive, intimidating, or offensive.
Under the first prong of the test, a plaintiff is required to show by a preponderance of the evidence, i.e., that it is more likely than not, that the harassing conduct would not have occurred but for her sex. Id. at 604-05, 626 A.2d 445. When the harassing conduct is sexual or sexist in nature, as with sexual comments or touchings, the but-for element will automatically be satisfied. Id. at 605, 626 A.2d 445. When the harassing conduct is not sex-based on its face, a plaintiff must make a prima facie showing that the harassment would not have occurred but for her sex. Id. at 605, 626 A.2d 445. See also Muench v. Township of *267 Haddon, 255 N.J. Super. 288, 292-300, 605 A.2d 242 (App.Div. 1992); Andrews v. City of Philadelphia, 895 F.2d 1469 (3rd Cir.1990). A plaintiff could do so by showing that such non-facially sex-based harassment was accompanied by harassment that was obviously sex-based. Lehmann, supra, at 605, 626 A.2d 445. Upon making such a prima facie case, a rebuttable presumption arises that the non-facially sex-based harassment occurred because of the plaintiff's sex. Ibid. Regarding the third element, the "reasonable woman," while not hypersensitive, includes women who fall toward the more sensitive side of the spectrum of reasonableness. Id. at 613, 626 A.2d 445. In addition, when the plaintiff is a woman, a court should not apply the perspective of a reasonable male who is more likely to view sexual conduct as a harmless joke. Id. at 614-15, 626 A.2d 445.
In addition to applying the four-prong test, we must determine for whose conduct Nabisco could be held responsible. Lehmann established a three-part standard to be applied in determining an employer's liability for hostile work environment sexual harassment by the employee's supervisor. The Court held that the employer is strictly liable for all equitable relief, including reinstating the harassment victim and providing back pay and/or front pay. Id. at 617, 626 A.2d 445. As for compensatory damages, the Court held that employer liability shall be governed by the agency principles set forth in Section 219 of the Restatement (Second) of Agency as follows:
(1) A master is subject to liability for the torts of his servants committed while acting within the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a non-delegable duty of the master, or
(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon the apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
[Id. at 619, 626 A.2d 445.]
*268 Under section 219(2)(b), the employer is liable for negligence. Lehmann, supra, 132 N.J. at 621, 623, 626 A.2d 445. Whether the employer has a well-publicized and enforced anti-harassment policy constitutes strong evidence on the issue, but is not automatically conclusive. Id. at 621-22, 626 A.2d 445. If the employer had actual or constructive knowledge of the harassment and did not promptly and effectively act to stop it, it will be liable. Id. at 622, 626 A.2d 445.
The Court recognized that its standard for compensatory damages would result in employer liability in most cases. Id. at 620, 623, 626 A.2d 445. It declined to impose strict liability because, in some cases such as where a supervisor rapes a subordinate in the workplace, the employer should not be held liable. Id. at 624, 626 A.2d 445.
As for punitive damages, an employer can be held liable only if its conduct is "especially egregious," which would be the case "only in the event of actual participation by upper management or willful indifference." Id. at 624-25, 626 A.2d 445.
This three-part standard governs Nabisco's liability for the conduct of Montalto, but not of Dr. Ferraro, since only the former was plaintiff's supervisor. Nabisco contends that it is not responsible for Dr. Ferraro because he was an independent contractor. The issue is one of first impression.
Our Supreme Court has noted that, in construing the LAD, federal precedent governing Title VII is "a key source of interpretive authority." Lehmann, supra, 132 N.J. at 600-01, 626 A.2d 445. The EEOC regulation interpreting Title VII states that
An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.
[29 C.F.R. 1604.11(e) (emphasis added).]
All federal cases citing 29 C.F.R. 1604.11(e) have followed it. E.g., Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir.1996); *269 Powell v. Las Vegas Hilton Corp., 841 F. Supp. 1024, 1027-28 (D.Nev. 1992); Magnuson v. Peak Technical Services, Inc., 808 F. Supp. 500, 512-13 (E.D.Va. 1992). The regulation governing employer liability for sexual harassment by fellow employees, 29 C.F.R. 1604.11(d), which corresponds with the first sentence of 29 C.F.R. 1604.11(e), has similarly been followed. Fleenor v. Hewitt Soap Co., 81 F.3d 48 (6th Cir.1996); Rowinsky, supra.
We apply both 29 C.F.R. 1604.11(d) and (e) to the LAD. The overwhelming body of federal precedent has applied them to Title VII. We can see no policy reason not to apply them to the LAD. Regarding subsection (e), it must be emphasized that, while the harasser may not be an employee, the victim is an employee. An employer that knows or should know its employee is being harassed in the workplace, regardless of by whom, should take appropriate action. The fact that an employer has less control over an independent contractor is not made irrelevant by the adoption of 29 C.F.R. 1604.11(e), which explicitly makes the degree of control a factor to be considered.
Plaintiff concedes that Dr. Ferraro was an independent contractor both in her deposition and her brief. Therefore, the standard of 29 C.F.R. 1604.11(e) applies. See Zorn v. Helene Curtis, Inc., 903 F. Supp. 1226, 1235 (N.D.Ill. 1995) (person deemed to be independent contractor where plaintiff referred to the person as such in her deposition).
Before applying the above tests, it must be emphasized that plaintiff appeals from a grant of summary judgment. In Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 540, 666 A.2d 146, our Supreme Court held that
a determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.... Credibility determinations will continue to be made by a jury and not the judge.
Applying the first prong of the Lehmann test to Montalto's conduct, his frequent comment that Pirozzi did not get either *270 of Cahill's two positions because she was "a woman and a pain in my ass" was explicitly sex-based and clearly would not have been made if Pirozzi were not a woman. Several of his other comments were also facially sex-related, including those about getting "lucky," his "douche" comment, and his "PMS" comments. It also would be reasonable to infer that, more likely than not, Montalto would not have made derogatory comments about her nails and hair if she had been a man. When Montalto's non-facially sex-based conduct, calling Pirozzi a "loser" and throwing a softball over her head, is placed in the context of the facially sex-based comments, Pirozzi has made a prima facie showing that it more likely than not would not have occurred if she were a man. See Lehmann, supra, 132 N.J. at 605, 626 A.2d 445; Muench, supra, 255 N.J. Super. at 292-300, 605 A.2d 242.
As for the conduct of Dr. Ferraro and others, it also satisfies the but-for test because it was facially sex-based. Tom Westin's comment, that he did not want to hire Pirozzi because she was an attractive divorcee who would only be looking "for a husband or to get laid," clearly would less likely have been made had Pirozzi been a divorced man. Ted Wimberly's comment also was facially sex-based. Similarly, Dr. Ferraro's various comments were all to one degree or another facially sex-related and satisfy the but-for test.
The motion judge based his decision on the second prong, finding that the conduct was not "severe or pervasive" since Pirozzi "admits in her own testimony that incidents occurred, quote, `every so often.'" However, while particular comments were made more or less "every so often"  Montalto made his "you're a woman and a pain in my ass" comment "frequently," his "loser" comment about "once or twice a week," and his "PMS" comment about "twice a month"  collectively these comments were made frequently, not "every so often." Considering the cumulative effect of all the frequent comments and incidents, and that most of them occurred within a span of one year, a rational juror could conclude the conduct was pervasive enough to make a reasonable woman, which includes a woman on the sensitive end of the spectrum of reasonableness, Lehmann, supra, 132 N.J. at *271 613-15, 626 A.2d 445, believe that her work environment was hostile, abusive, intimidating, or offensive.
Having determined that Pirozzi's claim survives the four-prong test if the alleged conduct is considered as a whole, we must determine if a genuine issue of material fact exists as to whether Nabisco is liable for the alleged conduct. Regarding equitable relief, Nabisco is strictly liable for Montalto's conduct. Lehmann, supra, 132 N.J. at 617, 626 A.2d 445. As for compensatory damages, Nabisco is not liable for Montalto's conduct under section 219(1) of the Restatement because it was not within the scope of his employment given that he was acting contrary to Nabisco's published policy against sexual harassment and that his comments were generally derogatory personal remarks not made as part of exercising his duties. See Farmers Ins. Group v. County of Santa Clara, 11 Cal.4th 992, 47 Cal. Rptr.2d 478, 906 P.2d 440 (1995).
Furthermore, no rational juror could find Nabisco negligent or reckless under The Restatement, section 219(2)(b) regarding Montalto. Pirozzi complained only once about Montalto, when in February 1991 she reported his "PMS" comment to Geso and was told that they needed to work out their problem themselves. While Nabisco's sexual harassment complaint procedures may not have worked perfectly, they were utilized, as reflected by the ultimate termination of Dr. Ferraro. Pirozzi should have registered another complaint about Montalto when his harassing conduct continued.
However, a rational juror could find Nabisco liable for Montalto's conduct under Restatement section 219(2)(d) by concluding that Montalto's position as Pirozzi's supervisor more likely than not aided him in harassing her. A person almost always will feel more at liberty to abuse someone over whom they have power. The Court in Lehmann thus noted that in most cases an employer will be liable for a supervisor's actions and pointed to the extreme case of rape as an example of why it did not hold employers *272 strictly liable for compensatory damages. Montalto's actions were not comparably removed from the employment situation to relieve his employer from liability. Therefore, Nabisco could be held liable for Montalto's conduct under section 219(2)(d).
As for Dr. Ferraro and the others, we apply the negligence tests of 29 C.F.R. 1604.11(d) and (e). While Nabisco was not negligent regarding Westin's comment since Pirozzi never complained about it, it could be found negligent regarding Wimberly's comment since Montalto and Geso asked her not to complain further since Nabisco was having problems with the union. As for Nabisco's handling of Dr. Ferraro's conduct, the motion judge found that Nabisco could not be held liable because it promptly investigated Pirozzi's complaints and discharged Dr. Ferraro. However, he ignored the fact that when, at the February or March 1990 meeting, Dr. Ferraro stated that Pirozzi had left her previous employer because she was "doing" all the residents, neither Montalto nor Matwick took any action. In addition, Montalto did nothing in response to Pirozzi's complaint about Dr. Ferraro's comment that she was getting so much done in the Medical Department that she must be sleeping with someone. In response to Pirozzi's subsequent complaint about Dr. Ferraro's statement that Pirozzi was having a sexual affair with Dr. Shmause, Montalto laughed, asked Pirozzi if she was in fact having such an affair, and took no action. Only after Dr. Ferraro's remarks at the March 1991 meeting did Nabisco finally investigate. However, Pirozzi was told by Geso that she would have to work with him for a while. Furthermore, Pirozzi claims that nothing was done when she complained to Geso about Dr. Ferraro's comment that she had AIDS. Eventually, in June 1991, Nabisco terminated its relationship with Dr. Ferraro, partly because of his March 1991 statements and partly for business reasons.
While Nabisco did eventually fire Dr. Ferraro, it took no action in response to several incidents prior to the March 1991 incident. Furthermore, the three months it took after March 1991 to terminate Dr. Ferraro was a long time for Pirozzi to be forced to *273 continue to work with him after everything he had said, indicating that Nabisco may have had its own business interests in mind more than Pirozzi's. Therefore, a rational juror could conclude that Nabisco was negligent regarding Dr. Ferraro's harassment of Pirozzi. 29 C.F.R. 1604.11(e)'s "control" factor does not alter this conclusion. Nabisco had an adequate measure of control over Dr. Ferraro's relationship with its employees, as reflected by the numerous meetings attempting to resolve the problems between Dr. Ferraro and plaintiff.
Because a rational juror could find that Nabisco is liable for virtually all of the conduct alleged by Pirozzi and that that conduct as a whole satisfies the Lehmann four-pronged test, and because we find Nabisco's First Amendment argument inapplicable to the facts as presented in this summary judgment posture (discussed hereinafter), we reverse the motion judge's grant of summary judgment against Pirozzi's sexual harassment claim for equitable remedies and compensatory damages.
We affirm the dismissal of Pirozzi's punitive damages claim. She does not allege that anyone above her immediate supervisor engaged in sexually harassing conduct. In addition, while Nabisco's handling of Dr. Ferraro's behavior may have been negligent, it was not "especially egregious" or "willfully indifferent" given Montalto's and Geso's immediate disapproval of his March 1991 comment, the investigation that was conducted, and his ultimate termination.

II
Nabisco contends that, even if the sexual harassment claim should not have been dismissed under the LAD, it must be dismissed because the LAD violates the First Amendment right to freedom of speech where it prohibits sexual harassment consisting solely of verbal comments. It bases its argument on R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) and State v. Vawter, 136 N.J. 56, 642 A.2d 349 (1994), which followed R.A.V. We are satisfied that the First Amendment argument need not be addressed because it is inapplicable. Nabisco *274 has incorrectly characterized the harassment in this case as "solely verbal." It is not. Neither the ball-throwing incident nor the security guard incident was verbal. In addition, plaintiff has sued Nabisco, not any individual. Nabisco's possible liability is premised largely on its negligent conduct in failing to adequately respond to Dr. Ferraro's treatment of plaintiff, which does not raise First Amendment concerns. See Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1534-35 (M.D.Fla. 1991). Furthermore, such an important issue should not be considered without the benefit of a complete factual record developed at trial and briefs that more fully address the issue. Baliko v. Stecker, 275 N.J. Super. 182, 192-93, 645 A.2d 1218 (App.Div. 1994).

III
The motion judge dismissed plaintiff's retaliation claim, but did not address the issue in the opinion. Plaintiff argues that summary judgment against this claim should not have been granted.
N.J.S.A. 10:5-12(d) of the LAD provides that the following constitutes unlawful retaliation:
d. For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint ... under this act. .. .
To establish a prima facie case of retaliation, plaintiff must show that 1) she was engaged in a protected activity known to the defendant; 2) she was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two. Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 548-49, 665 A.2d 1139 (App.Div. 1995). If plaintiff establishes a prima facie case, the burden of production (but not the burden of persuasion) shifts to defendant to articulate a legitimate reason for the decision. Id. at 549, 551, 665 A.2d 1139. Plaintiff must then show that a retaliatory intent, not the proffered reason, motivated defendant's actions. Id. at 551, 665 A.2d 1139. Plaintiff may do this either indirectly, by proving that the proffered reason is a pretext for the retaliation, or directly, by demonstrating that a retaliatory reason more likely than not motivated defendant's action. Ibid.
*275 Pirozzi clearly engaged in protected activity known to Nabisco by filing NJDCR and EEOC charges. We further conclude that a genuine issue of fact exists regarding whether Nabisco's August 1991 promotion of Cahill/demotion of Pirozzi was adverse to Pirozzi since her responsibilities were reduced significantly.
Regarding whether Pirozzi's filing of NJDCR and EEOC charges more likely than not was the actual cause of Nabisco's "promotion" of Cahill/"demotion" of Pirozzi, Pirozzi has failed to create a genuine issue of material fact. As Nabisco points out, Montalto explained to Pirozzi when Matwick vacated his position in May 1990 that she was not qualified for the safety position and Pirozzi admitted that Cahill, but not she, was qualified for the Safety Specialist position. In addition, Pirozzi stated, in an excerpt from Pirozzi's deposition that was not before the motion judge but was included by Pirozzi in her appendix, that Matwick told her when he hired her that Nabisco was planning eventually to merge the medical and safety departments.[1] Since it is uncontested that Nabisco was planning to merge the departments long before Pirozzi filed charges or experienced any harassment, and Pirozzi was not qualified for the safety aspect of the "new" position given to Cahill, a rational juror could not find that Pirozzi should have been promoted instead of Cahill or that Nabisco decided to merge the departments solely as a pretext for demoting her in retaliation for filing charges. We therefore affirm the dismissal of Pirozzi's retaliation claim.

IV
Plaintiff also appeals from the grant of summary judgment dismissing her constructive discharge claim. In Muench, *276 supra, 255 N.J. Super. 288, 301-02, 605 A.2d 242, we held that an employer will be held liable for constructively discharging an employee when "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." In an opinion concurring in part and dissenting in part in T.L. v. Toys `R' Us, Inc., 255 N.J. Super. 616, 663, 605 A.2d 1125 (App.Div.), certif. den., 130 N.J. 19, 611 A.2d 657 (1992), aff'd as modified sub nom., Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), Judge Skillman stated that an employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit. Therefore, once the employer is found to have violated the LAD,
the trial court should [,in applying the reasonable employee test of Muench,] consider the nature of the sexual harassment, the closeness of the working relationship between the harasser and the victim, whether the employee has resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances. [Ibid.].
Here, Pirozzi claims that she was constructively discharged as of April 1992 since that is when she became medically able to work yet decided not to return to Nabisco. The motion judge erred in finding that Pirozzi did not return solely because of the advice of her attorney since she also asserted that, regardless of the advice of her attorney, she would not have returned to Nabisco because of what she had experienced there.
However, even if Pirozzi resigned because of the harassment, Nabisco did not knowingly permit discriminatory conditions so intolerable that a reasonable person subject to them would resign. When she decided in April 1992 not to return, Dr. Ferraro had already been terminated and Montalto was no longer her supervisor. Moreover, the "promotion" of Cahill/"demotion" of Pirozzi was not retaliation and so cannot be considered a reasonable basis for her decision to resign. No rational juror could find that the conditions were so intolerable that Pirozzi's decision not to return *277 was reasonable given her obligation under T.L., supra, not to simply quit and the relevance under T.L. of the closeness of the working relationship between the harasser and victim. We therefore affirm the dismissal of Pirozzi's constructive discharge claim, albeit on different grounds. Accordingly, we affirm the dismissal of plaintiff's claims for back pay and front pay because they depend on finding constructive discharge, T.L., supra, 255 N.J. Super. at 662, 605 A.2d 1125. In view of this holding, we need not address Nabisco's argument that Pirozzi's claim for back pay was properly dismissed because she failed to mitigate her damages by seeking other employment.

V
In conclusion, we affirm summary judgment dismissing plaintiff's retaliation claim and constructive discharge claim, which includes her claims for back pay and front pay. We reverse the dismissal of her sexual harassment claim insofar as it furnishes a basis for equitable remedies (other than back pay, front pay, or reinstatement) and compensatory damages, and remand for trial. We, however, affirm the dismissal of the punitive damages claim.
NOTES
[1] Ordinarily, we would require a motion to supplement the record before considering such material. R. 2:5-4; R. 2:5-5. However, in view of the fact that, since the motion judge did not discuss the retaliation claim at all, we are exercising our original jurisdiction in doing so, and the fact that the excerpts only influence our decision against the party that included them, we see no reason to require a motion.