NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3252-12T1

BRIAN DUNKLEY,

     Plaintiff-Appellant,

v.

S. CORALUZZO PETROLEUM
TRANSPORTERS,

     Defendant-Respondent.

_____

<table>
<tr><td><b>APPROVED FOR PUBLICATION</b></td></tr>
<tr><td><b>September 16, 2014</b></td></tr>
<tr><td><b>APPELLATE DIVISION</b></td></tr>
</table>

Argued June 4, 2014 - Decided September 16, 2014

Before Judges Lihotz, Maven and Hoffman.

On appeal from the Superior Court of New
Jersey, Law Division, Atlantic County,
Docket No. L-6863-10.

Richard E. Yaskin argued the cause for
appellant (Mr. Yaskin and William Riback,
attorneys; Mr. Riback and Alix Schwartz, on
the briefs).

Erin L. Peters argued the cause for
respondent (Golden, Rothschild, Spagnola,
Lundell, Boylan & Garubo, P.C., attorneys;
Daniel B. McMeen, of counsel and on the
brief; Ms. Peters, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

Plaintiff Brian Dunkley appeals from an October 12, 2012

order granting defendant S. Coraluzzo Petroleum Transporters

summary judgment and dismissing plaintiff's complaint claiming violations of New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Plaintiff's complaint alleged hostile work environment, constructive discharge, and violation of public policy. Plaintiff also appeals from an order denying his motion for reconsideration of the summary judgment dismissal and a May 23, 2012 order entering a protective order related to a prior sexual harassment claim filed against defendant.

On appeal, plaintiff challenges the entry of summary judgment, asserting the judge based his conclusion on erroneous factual findings and improperly limited necessary discovery. Viewing the facts in the summary judgment record, in a light most favorable to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), we conclude plaintiff's complaints of avoidance by fellow employees after he reported acts of racial discrimination by a co-worker are insufficient to support an LAD claim for retaliatory discharge or impose vicarious liability on the employer. Accordingly, we affirm.

Plaintiff commenced his employment with defendant as an oil delivery driver on May 4, 2010. Defendant provided plaintiff with an employee handbook, which contained the rules governing his employment. Plaintiff also attended two days of in-class safety training and two weeks of "on-road" on-the-job training.

Richard Harrington, another truck driver, was assigned as plaintiff's on-road trainer. During the training period, plaintiff accompanied Harrington as he "dr[ove] to a refinery, g[ot] oil and then [went] on a set route and deliver[ed] the oil[.]" Harrington also instructed plaintiff regarding "the actual job," which included "loading and offloading oil or fuel[.]"

In the course of the two-week training period, Harrington made numerous race-related comments directed toward plaintiff, an African-American, or in his presence. On plaintiff's first day, Harrington stated "I'm from Ohio and you know what originated there don't you?" When plaintiff replied that he did not, Harrington stated: "The Klan. The Klan originated there." Harrington repeated a reference to the Klan on another occasion; however, he never clarified whether he had an affiliation with the group.

Harrington also recounted anecdotes insinuating he was tied to a motorcycle gang. For example, Harrington told plaintiff his father was a member of a motorcycle gang and recounted an incident where a

> local guy came over to his dad's property
> and he engaged in an argument with the guy,
> and the guy said he was going to do
> something to his father as far as bodily
> harm. And his father made one phone call to
> the leader of this motorcycle gang and he

came over, got in a tussle with the guy, and the guy was in fear of his life and he had left the premises. And he told [plaintiff] if [h]e or anybody ever had a problem with his family, that they would be taken care of.

Plaintiff believed Harrington was relating these accounts because he "was trying to, for some reason[,] put fear into me."

Plaintiff also reported statements made by Harrington that he believed were racially offensive, such as: "Allen Iverson and his friends are black thugs from a bad neighborhood," which plaintiff felt stereotyped African-Americans. On another occasion, Harrington told plaintiff his truck was vandalized when he stopped at a red light and "[plaintiff's] little brothers, . . . came out and they paintballed [my] truck[.]" Harrington also conveyed derogatory comments complaining about African-American women he saw in a grocery store, stating

how he's tired of the girls with the food stamps in the line, and . . . he started mimicking them[] how they talk. And then he start[ed] saying, "I got my food stamps and I don't care who's waiting in line," this and that, because they were holding up the line of some sort. And then he said to [plaintiff], "You look in their basket, they are eating T-bone steaks and stuff better than I can eat because it's all given to them with the state, food stamps."

When their truck needed repair, Harrington and plaintiff went to an African-American mechanic. Harrington addressed the mechanic as he prepared to work on the truck, stating: "I want

to — it looks like you're — I want to say the word, but I can't. . . . . I can't say the word. I'll get in trouble. . . ." The mechanic responded, "I know what you are trying to say. You're trying to say it looks like I'm nigger rigging." Harrington agreed that was "what I am trying to say, but I can't say it because I'll get in trouble."

When plaintiff did not report for work, Elwood Sickler, defendant's safety coordinator, called to inquire about his absence. Plaintiff explained "there w[ere] a lot of reasons" he decided not to come into work. The next day, plaintiff met with Sickler, Thomas Sprague, defendant's safety director, and Steve Coen, defendant's regional safety manager. Plaintiff recounted the incidents with Harrington, using a list he had prepared the prior evening, explaining these were "things that were bothering me, why I didn't want to work there[.]"

Following this meeting, plaintiff received a phone call from Sickler informing him a new trainer, Greg Castellini, was assigned as his instructor. Plaintiff returned to work approximately one day later, and never again saw or spoke to Harrington. Following his reassignment to work with Castellini, plaintiff suffered no treatment similar to that experienced with Harrington.

However, plaintiff insisted he endured negative consequences after reporting Harrington's conduct, and these consequences caused his constructive discharge. He noted his report was not kept confidential and he felt ostracized by co-workers, who "would shy away" from him. "The guys that were in the yard that [he] used to know, they wouldn't even say a word to [him] after that. And everybody knew [he] was with [Harrington], and then all of a sudden [there was] a big change." Further, when plaintiff attempted to speak with Sickler, he was "advised that because [plaintiff] had brought a complaint [about] the hostile work environment, [he] was being outcasted [sic]."

Plaintiff also told Castellini he did not receive proper training from Harrington; Castellini agreed Harrington had instructed him incorrectly on a number of protocols. Plaintiff noted Harrington had not taught him how to operate the truck's computer, failed to instruct him not to pressurize the truck after unloading fuel and did not advise him not to take vendors' keys.

Castellini reported Harrington's lapses to "management." On the day he learned Castellini had done so, plaintiff was involved in a gasoline spill.

> [E]arlier in the day, [plaintiff] had found
> out that . . . [Castellini] had told [him] a

couple of things that [Harrington] was doing wrong that . . . he was trying to correct . . . ., and then [plaintiff] . . . told [Castellini], . . . "I really didn't want you to tell" — "I really didn't want you to go tell [Sickler] because, you know, I didn't" — "everything is all screwed up here as it is." [Plaintiff was] like, ["Castellini], I'm already in a situation where I don't feel like I am going to get any help from these guys. I feel like I'm a troublemaker, and I just feel like, you know, there's enough stirred up right now. If I tell you what he taught me and how you are teaching me the right way, I mean, I just didn't know you were going to go tell him.["] [Castellini] said "Yeah, I told him." So [plaintiff] said, "That's fine," but [he] was just upset about it.

Plaintiff maintained the spill occurred because he

wasn't paying attention to something that was very stupid. So [he] said if [he] could do that, [he was] going to harm [him]self, blow something up or have a bad spill, and [he] just was so frustrated with [him]self and mad at [him]self about the spill, but it was because [he] wasn't concentrating because all this stuff was in [his] mind and bothering [him].

Plaintiff insisted he was uncomfortable at work and "felt like [his] life was threatened" because he was not sure whether Harrington was affiliated with a motorcycle gang or "the Klan," or whether these groups "had chapters around Vineland[,]" where defendant was located, as he knew "Vineland had had a Klan meeting [at a nearby park] when [he] was younger . . . ." As a result, plaintiff remained concerned for his and his family's

safety. The immense daily stress made plaintiff "hate being there [at work] at that time." Following the spill, plaintiff resigned.

Plaintiff filed a complaint against defendant and unnamed John Does 1-10, claiming violations of the LAD, alleging defendant allowed conduct amounting to a hostile work environment (counts one and two), which caused his constructive discharge (count three), and violated public policy (count four). Plaintiff amended his complaint to add a claim for violating the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8 (count five).

Approximately one month before trial, defendant moved for summary judgment. Plaintiff filed a cross-motion to strike defendant's motion for summary judgment. After considering oral argument and the record evidence, the judge granted defendant's motion, denied plaintiff's cross-motion, and dismissed the complaint. Plaintiff's request for reconsideration was similarly denied. This appeal ensued.

Prior to reviewing the issues presented on appeal, we recite the principles guiding our review. When reviewing a grant of summary judgment, we employ the same standards used by the motion judge, found in Rule 4:46. Gormley v. Wood-El, 218 N.J. 72, 86 (2014). We determine whether the moving party has

demonstrated there were no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230-31 (App. Div. 2006), certif. denied, 189 N.J. 104 (2006). Specifically, we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540. "[W]hen the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Ibid. (citation and internal quotation marks omitted).

However, we accord no deference to the motion judge's conclusions on issues of law, Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83 (2010); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), which we review de novo. W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012) (stating if no genuine factual dispute exists, we must decide whether the trial court's ruling on the law, to which we owe no deference, was correct).

On appeal, plaintiff maintains the judge correctly determined he presented a prima facie case of harassment, but

erred in dismissing the action, after finding Harrington was not plaintiff's supervisor and concluding defendant was not vicariously liable for Harrington's actionable conduct. Plaintiff argues defendant failed to take proper steps to curb discriminatory conduct because defendant's anti-harassment policy lacked structure and monitoring mechanisms; defendant did not train its supervisors and employees regarding the anti-harassment and anti-retaliation policies; and plaintiff's complaints were not effectively addressed as defendant's upper management did not show "an unequivocal commitment" to assure "harassment would not be tolerated."

The LAD is remedial legislation designed "to root out the cancer of discrimination[.]" Cicchetti v. Morris Cnty. Sherriff's Office, 194 N.J. 563, 588 (2008) (citing Fuchilla v. Layman, 109 N.J. 319, 334, cert. denied, 488 U.S. 826, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988)). The statute prohibits unlawful employment practices and discrimination in the form of harassment, "based on race, religion, sex, or other protected status, that creates a hostile work environment." Cutler v. Dorn, 196 N.J. 419, 430 (2008) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993)). See N.J.S.A. 10:5-12(a). Further, it prohibits reprisals against an employee who asserts rights granted by the LAD. N.J.S.A. 10:5-12(d).

> To establish a cause of action under the LAD based on a hostile work environment, plaintiffs must satisfy each part of a four-part test. Specifically, they must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. Within that framework, a court cannot determine what is "severe or pervasive" conduct without considering whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile. Thus, the second, third, and fourth prongs are, to some degree, interdependent.
>
> [Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002) (citations omitted).]

In the context of race discrimination, the first element requires a plaintiff to show harassment occurred because of his or her race. Lehmann, supra, 132 N.J. at 603. The second element assesses "'[t]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'" Id. at 607 (quoting Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)). Usually, repeated incidents are required. However, even a single severe incident may create a hostile work environment in certain circumstances. Taylor v. Metzger, 152 N.J. 490, 500-02 (1998). See also Cutler, supra, 196 N.J. at 430, 432 n.7

(applying same principles to a hostile work environment claim involving religious affiliation).

When considering a claim of hostile work environment under the LAD, the test is fact sensitive and the court must review the totality of circumstances presented. El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 178 (App. Div. 2005). The inquiry is whether a reasonable person in plaintiff's protected class would consider the alleged discriminatory conduct "'to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment.'" Ibid. (quoting Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 147 (App. Div. 1999), overruled on other grounds by Cutler, supra, 196 N.J. at 440). The court weighs the "severity and pervasiveness by considering the conduct itself rather than the effect of the conduct on any particular plaintiff." Id. at 178-79. The factors evaluated include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Shepherd, supra, 174 N.J. at 19-20 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 2074, 153 L. Ed. 2d 106, 124 (2002)).

12

To prove "a prima facie case of retaliation, plaintiff must show that 1) [he or] she was engaged in a protected activity known to defendant; 2) [he or] she was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two." Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996) (citation omitted). See also Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995). Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a "legitimate[,] non-retaliatory reason" for the decision. Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990). If defendant satisfies this burden, the plaintiff must then demonstrate that a retaliatory intent, not the employer's stated reason, motivated the employer's action, proving the employer's articulated reason was merely a pretext for discrimination. Woods, supra, 290 N.J. Super. at 274; Jamison, supra, 242 N.J. Super. at 445.

"[A] person engages in a protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." Young v. Hobart W. Grp., 385 N.J. Super. 448, 466 (App. Div. 2005). See also Jamison, supra, 242 N.J. Super. at 445 ("Such an unlawful employment practice occurs when an

employer, or an employee, for any reason, takes reprisal against another employee because the latter has challenged any practices or acts forbidden by the LAD.") (citing N.J.S.A. 10:5-12(d)). As a starting point, protected activity, if involving a complaint, must concern discrimination. Reyes v. McDonald Pontiac-GMC Truck, Inc., 997 F. Supp. 614, 619 (D.N.J. 1998) (finding complaints stemming from "outbursts and name-calling" not sexual in nature do not suffice). "A general complaint of unfair treatment" does not suffice. Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) (finding a letter to the employer expressing dissatisfaction over someone else receiving a promotion is not protected activity because it did not allege age discrimination).[1]

In Lehmann, the Court held an "employer should be liable for punitive damages [under the LAD] only in the event of actual participation by upper management or willful indifference." Lehmann, supra, 132 N.J. at 625. This principle was reinforced

---

[1] This case construed the retaliation provision of the federal Age Discrimination in Employment Act, 29 U.S.C.A. § 623(d); however, the wording is substantially the same as the LAD provision under review. New Jersey courts generally look to federal anti-discrimination jurisprudence in construing the LAD because LAD "standards have been influenced markedly by the experience derived from litigation under federal anti-discrimination statutes." Shaner v. Horizon Bancorp, 116 N.J. 433, 437 (1989). See also Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 370 (2007).

in Taylor as "the Court noted that '[a] supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace.'" Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 118 (1999) (quoting Taylor, supra, 152 N.J. at 503).

Omissions may also suffice as "an employer that failed to take effective remedial measures against a harassing employee was, in essence, liable for its own conduct." Payton v. N.J. Turnpike Auth., 148 N.J. 524, 536 (1997) (citation omitted). This results because "[w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." Ibid. (citation omitted).

Here, the motion judge agreed plaintiff presented a prima facie case of hostile work environment, stating:

> After viewing the evidence in a light most favorable to [p]laintiff, this [c]ourt is satisfied . . . given the severity and pervasiveness of Mr. Harrington's conduct, reasonable minds could differ as to whether [p]laintiff suffered a hostile work environment. The conduct [p]laintiff complains of consisted of several racially discriminatory remarks regarding African Americans over the course of two weeks. This was not an isolated instance but rather a series of conduct that persisted until [p]laintiff complained to [d]efendant's managerial employees.

Notwithstanding this showing, the judge concluded plaintiff had not sustained his burden to prove defendant was vicariously liable for Harrington's conduct because he could not demonstrate defendant's supervisors knew about and ignored, participated in or failed to take action to prevent such harassing conduct. See Tyson v. CIGNA Corp., 918 F. Supp. 836, 840-41 (D.N.J. 1996), aff'd, 149 F.3d 1165 (3d Cir. 1998); Shepherd, supra, 174 N.J. at 26-27.

Plaintiff disagrees. First, he maintains Harrington was his supervisor, making defendant vicariously liable for his discriminatory conduct. Second, he believes proofs evinced defendant ignored or otherwise failed to address the existing discrimination. Plaintiff hinges support on the absence of a formal investigation of the incidents he related, noting Sickler, Sprague and Coen did not report his allegations to Human Resources or senior management, such as defendant's president, owners or vice president of operations. Also, plaintiff asserts Sickler and Sprague had no specific training regarding how to stop discriminatory conduct, and no adverse action was taken against Harrington.

Whether Harrington could be deemed plaintiff's supervisor during the two-week training period is debatable. Although Harrington had no power to fire or demote plaintiff and he could

16                                                        A-3252-12T1

not alter his position or compensation, he was charged with plaintiff's on-road training, during which he directed plaintiff and identified plaintiff's job responsibilities. There were instances when comments by Harrington to Sickler caused Sickler to speak to plaintiff. If the determination of Harrington's supervisory status was the only test to impose vicarious liability upon defendant, summary judgment would have been prematurely granted. However, Lehmann and its progeny make clear vicarious liability is dependent upon additional facts.

An employer's vicarious liability for the conduct of a supervisor occurs "'if the employer negligently or recklessly failed to have an explicit policy that bans . . . harassment and that provides an effective procedure for the prompt investigation and remediation for such claims.'" Toto v. Princeton Twp., 404 N.J. Super. 604, 616 (App. Div. 2009) (quoting Cicchetti, supra, 194 N.J. at 591). See also Lehmann, supra, 132 N.J. at 621 (stating that to impute liability to a defendant-employer for acts of its employees, "a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint mechanism structures, training, and/or monitoring mechanisms.").

Here, defendant produced its employee handbook, enacted on March 1, 2010, which contained a directed policy prohibiting harassment and discrimination. Defendant demonstrated it provided the handbook to each employee, and employees are directed to read the handbook "completely and become familiar with all the policies and the information that is provided." Relevant to this matter, the employee handbook provided:

> The [e]mployer will not tolerate any type of harassment of employees, applicants for employment, or customers. Discriminatory conduct or conduct characterized as harassment as defined below is prohibited.
>
> The term harassment includes, but is not limited to, slurs, jokes, and other verbal or physical conduct relating to a person's gender (including pregnancy), race, color, religion, national origin, age, disability, military status, creed, ancestry or any other protected category under federal, state or local law that unreasonably interferes with a person's work performance or creates an intimidating, hostile work environment.

The handbook described the complaint procedure and investigation process as follows:

> Any employee who has a concern regarding harassment or discrimination must report the matter to their manager. If that person is not available, or you believe it would be inappropriate to contact that person, contact the Human Resources Department.
>
> The [e]mployer will conduct a prompt investigation as confidential as possible

18

under the circumstances. Employees who raise concerns and make reports in good faith can do so without fear of reprisal; at the same time, employees have an obligation to cooperate with the [e]mployer in enforcing this policy and investigating and remedying complaints.

Any employee who becomes aware of possible . . . illegal discrimination against others must promptly advise their manager or the Human Resources Department.

Anyone found to have engaged in such wrongful behavior will be subject to appropriate discipline, up to and including termination.

Also, there was an express anti-retaliation policy:

Any employee who files a complaint of sexual harassment or other discrimination in good faith will not be adversely affected in terms and conditions of employment and will not be retaliated against or discharged because of the complaint.

In addition, we will not tolerate retaliation against any employee who, in good faith, cooperates in the investigation of a complaint. Anyone who engaged in such retaliatory behavior will be subject to appropriate discipline, up to and including termination.

"[T]he existence of effective preventative mechanisms provides some evidence of due care on the part of the employer." Lehmann, supra, 132 N.J. at 621. Moreover, "the absence of such mechanisms" does not "automatically constitute[] negligence, nor [does] the presence of such mechanisms demonstrate[] the absence of negligence." Ibid.

> Employers that effectively and sincerely put five elements into place are successful at surfacing . . . harassment complaints early, before they escalate. The five elements are: policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally, an unequivocal commitment from the top that is not just in words but backed up by consistent practice.
>
> [Ibid. (citations omitted).]

We conclude the trial judge properly analyzed the evidence, which showed defendant adopted a formal anti-harassment and an anti-discrimination policy and developed a complaint procedure and investigation process. Plaintiff, as well as all other employees hired by defendant, received and acknowledged reading the handbook. Further, plaintiff admitted these policies were discussed during his initial two-day in-class training. No evidence suggests plaintiff was unable to voice his complaints or that they went unaddressed because of an ineffective policy. Here, despite knowing the procedures, plaintiff simply failed to follow them.

Contrary to plaintiff's assertion, we find defendant's policies were properly defined. When management learned of the problem, plaintiff's supervisors did not ignore his complaints

or overlook Harrington's reprehensible behavior. Rather, Sickler's proactive conduct discovered the problem. He immediately arranged a private meeting between plaintiff and other supervisors to review plaintiff's experiences. Upon gathering the facts from plaintiff, the supervisors acted to protect plaintiff from further discrimination.

In hindsight, unquestionably, one could suggest improvement in the depth of the process or the supervisors' training on these issues. Further, publicizing the Human Resources or other officer charged with enforcing the procedures is preferable. However, we cannot conclude the methods used here fail to meet established standards. More important, plaintiff's own report that after meeting with his supervisors, he did not experience any further discriminatory harassment and suffered no change in his position, duties or compensation, demonstrated the policy's effectiveness.

We also conclude plaintiff's perceived ostracism by co-workers fails to support his claim of hostile work environment. See Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 382-83 (Law Div. 2002) ("The fact that [the plaintiff's] co-workers and superiors chose to limit their contact with [him] to business only and otherwise ignored [him], stared/glared at [him] when they walked by [him], and, even as plaintiff

21                                                                    A-3252-12T1

believed — talked about [him] behind closed doors," fails to create a hostile work environment.), aff'd 362 N.J. Super. 245, 246-47 (App. Div.), certif. denied, 178 N.J. 32 (2003). The Supreme Court has explained, the LAD does not create a "sort of civility code for the workplace[.]" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 549 (2013). Rather, it advances "[f]reedom from discrimination." Id. at 546. Employee discourtesy and rudeness should not be confused with employee harassment. Further, an "unhappy" workplace does not equate to a hostile work environment under the LAD.

Following our review of the record, we determine the evidence shows the employer followed the steps outlined in Lehmann by adopting policies, offering a complaint procedure, providing on-going training, and addressing discrimination once presented. The summary judgment record does not create a dispute of material facts, as no conflicting evidence was offered to refute these proofs. The judge's conclusion that defendant was not vicariously liable for Harrington's conduct was a correct one.

Plaintiff next argues a reasonable jury could conclude he was constructively discharged because he endured "severe and pervasive" harassment, which negatively impacted his work performance and, in turn, adversely affected "public safety."

22 A-3252-12T1

Essentially, he calls into question the effectiveness of defendant's policy. We are not persuaded.

"'[C]onstructive discharge requires not merely severe or pervasive conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it.'" Zubrycky v. ASA Apple, Inc., 381 N.J. Super. 162, 166 (App. Div. 2005) (quoting Shepherd, supra, 174 N.J. at 28). The level of proof requires a showing of "egregious circumstances," which is even greater "than that required to establish a hostile work environment[.]" Ibid. The proofs must show "outrageous, coercive and unconscionable" acts. Ibid. (citing Shepherd, supra, 174 N.J. at 28).

As discussed above, plaintiff's assertions are insufficient to support a suggestion that despite his complaints, defendant failed to exercise due care to enforce its anti-harassment policy. See Gaines v. Bellino, 173 N.J. 301, 303 (2002) ("The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability."). Rather, plaintiff admitted once he informed his superiors, they took action, assigned him a new trainer and, thereafter, he experienced no problems. He further admits he never interacted with Harrington again. Plaintiff's proofs do not present a

genuine factual dispute allowing a jury to reasonably conclude defendant's responsiveness and other conduct was so unbearable that a reasonable person would be forced to separate from the employment because of the conduct. Shepherd, supra, 174 N.J. at 27-29. See also Woods, supra, 290 N.J. Super. at 276. Here, the harm was remedied immediately and effectively.

We also reject as unfounded plaintiff's claims he was improperly trained in safety measures. Plaintiff acknowledged Castellini instructed him on correct procedures. During plaintiff's training with Castellini, it was discovered that Harrington taught plaintiff incorrectly; these matters were addressed and Castellini informed Sickler of Harrington's errors.

Plaintiff's final challenge argues the judge erroneously barred disclosure of an unrelated 2008 sexual harassment complaint against one of defendant's "upper management" members. Plaintiff asserts this shows upper management's tolerance of harassment. We find this argument lacks sufficient merit to warrant review and discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION