**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4438-16T1

SANTA MALLON,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

HUDSON SAVINGS BANK,
and DENIS J. SALAMONE,
individually and in his official
capacity,

    Defendants-Appellants/
    Cross-Respondents,

and

RONALD E. HERMANCE, JR.,

    Defendant.

_____

Argued telephonically February 12, 2019 – Decided July 23, 2019

Before Judges Hoffman, Suter and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0466-13.

David Francis Jasinski argued the cause for appellants/cross-respondents (Jasinski, PC, attorneys; David Francis Jasinski, of counsel; Jennifer C. Van Syckle, Susan Barbara Burns and Rebecca D. Winkelstein, on the briefs).

Bruce L. Atkins argued the cause for respondent/cross-appellant (Deutsch Atkins, PC, attorneys; Bruce L. Atkins, of counsel; Carly Skarbnik Meredith and Michael Malatino, on the briefs).

Andrew William Dwyer argued the cause for amicus curiae National Employment Lawyers Association of New Jersey (Dwyer & Barrett, LLC, attorneys; Andrew William Dwyer, of counsel and on the brief).

PER CURIAM

Defendants Hudson City Savings Bank (Hudson City) and Denis J. Salamone appeal from a judgment for plaintiff in a case brought under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Defendants urge us to reverse, contending plaintiff failed to prove she engaged in a protected activity. Alternatively, they claim errors in the jury charge and verdict sheet, an evidentiary error, and misconduct by plaintiff's counsel also warrant reversal.

Plaintiff cross-appeals, arguing the trial court "erroneously dismissed [p]laintiff's claim for punitive damages" and "made numerous legal and factual errors in rendering its decision as to [p]laintiff's award of counsel fees and

costs." For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

I.

We derive the following facts from the trial record. Plaintiff's career at Hudson City spanned thirty-six years, beginning in 1975. Commencing in 1981, she reported to Michael Lee, then a Senior Vice President.

During her tenure, plaintiff received multiple promotions. In 2004, she reached her highest position, First Vice President, based on a recommendation from Lee. Salamone, then the bank's Chief Operating Officer, and defendant Ronald Hermance,[1] the bank's president, CEO, and Chairman, also approved the promotion.

Plaintiff's complaint alleged a glass ceiling at Hudson City prevented her from advancing beyond First Vice President. Plaintiff and Lee regularly spoke about gender discrimination at the bank, particularly in the highest levels of management. However, Lee discouraged plaintiff from pursuing the issue based on his concerns it could result in retaliation.

---

[1] Before trial, plaintiff stipulated to the dismissal of her claims against Hermance, after he passed away.

A-4438-16T1

As of 2011, the gender composition of Hudson City's management, at the Vice President level and above, remained predominantly male. Of twenty-seven Vice Presidents, eleven were women; of fourteen First Vice Presidents, four were women; of nine Senior Vice Presidents, one was a woman. Between 2001 and 2011, no women received a promotion to the Senior Vice President level, compared to fourteen men.

No females held the position of Executive Vice President in 2010, but the bank hired one in 2011, after its first choice – a male – proved unavailable; there were three other Executive Vice Presidents in 2011, all male. The bank's Board of Directors included seven or eight male members, and one female member.

Defendants denied a glass ceiling existed at Hudson City and maintained the bank made promotions based upon an employee's abilities, skills, talents, and willingness to assume greater responsibility; however, Hudson City did not have a formal policy or process for promotions. Generally, an employee would receive a promotion based on excellent performance, on the recommendation of the employee's supervisor. Up to the Senior Vice President level, promotion recommendations were submitted to Chris Nettleton, the head of human resources, and Salamone. Officer-level positions required approval by the Board of Directors.

A-4438-16T1

According to plaintiff, in August 2010, she told then-Executive Vice President, John Tassillo, she wanted "the same respect" and salary "as the males," and a promotion to Senior Vice President. Plaintiff also had several conversations with Lee about her desire for a promotion.

Lee viewed plaintiff as an exemplary employee. According to Lee, in December 2010 and January 2011, he discussed with Salamone and Hermance his recommendation for plaintiff to receive a promotion to Senior Vice President; however, these discussions were preliminary, and Lee did not confirm his request in writing. Salamone denied Lee ever recommended plaintiff for a promotion to Senior Vice President, as did Nettleton; however, Yolanda DiMari, a Vice President in human resources, testified plaintiff told her she wanted to be a Senior Vice President.

Plaintiff testified that over the course of her career with Hudson City, she did not receive any warnings or criticisms about her performance or behavior. Defendants disputed this contention, and highlighted three incidents that raised concerns about plaintiff: (1) a 2005 anonymous complaint alleging plaintiff and Lee were romantically involved, and that plaintiff received promotions because of Lee's influence; (2) a 2009 written warning plaintiff received for failing to

5

comply with the bank's policy regarding the sale of Hudson City stock; (3) a March 2011 ethics complaint filed against plaintiff by a Hudson City bank teller.

No disciplinary action was taken in response to the 2005 complaint, and plaintiff and Lee denied any romantic relationship. They were advised only to not have lunch together so often.

The warning plaintiff received in 2009 concerned an October 2008 stock sale. According to plaintiff, she notified the bank's Investor Relations Department before the sale, but "never made a call afterwards," because she "did not understand [she] needed to do it." The incident did not result in any other action against plaintiff.

A bank teller named Jill Ford filed the ethics complaint against plaintiff following a negative interaction between Ford and plaintiff's husband, when plaintiff's husband attempted to cash a $200 check. Both plaintiff and her husband signed the back of the check, and plaintiff gave her husband her employee identification card to verify her signature. Plaintiff's husband tried to cash the check on a joint checking account he maintained with plaintiff since 2004. Previously, the account belonged to plaintiff and her sister; however, in 2004, after the account became dormant, plaintiff deleted her sister's name from the account, and added her husband's name, with Lee approving the change.

A-4438-16T1

Ford declined to cash the check after looking up the account using plaintiff's husband's social security number and finding no account belonging to him. The complaint alleged plaintiff's husband attempted to use intimidation to get the check cashed, invoking plaintiff's position as an officer with the bank. Ford further complained Lee acted inappropriately when he told the branch manager to cash the check.

Along with DiMari from human resources, Paul Chaves from security, and Louis Beierle, a Senior Vice President in charge of audit functions, investigated the complaint. On April 26, 2011, DiMari, Chaves, and Beierle met with plaintiff and advised her of the bank policies she had violated, specifically the transfer of ownership of the checking account from her and her sister to her and her husband, a missing signature card, and allowing her husband to use her employee identification card. Plaintiff denied any wrongdoing, and insisted the branch acted inappropriately in failing to process her husband's transaction. After the meeting, plaintiff emailed Chaves and Beierle, and copied Lee and Salamone, with copies of relevant bank policies supporting her position.

On June 9, 2011, DiMari issued the final report of the investigation, which also alleged plaintiff violated additional bank policies relating to bank accounts belonging to plaintiff and her relatives. Chaves testified that the investigation

7

was "like peeling back the layers on [an] onion," with each person interviewed having a new tale to tell about plaintiff.

The investigators reported plaintiff acted as though the rules did not apply to her, and people were fearful of and intimidated by her. While numerous trial witnesses testified to plaintiff's combativeness, other witnesses testified they got along well with plaintiff.

In a meeting with plaintiff in June 2011, DiMari and Chaves raised an additional policy violation by plaintiff relating to an account opened by her niece. They maintained that since this was a joint account, the second owner should have been present. Plaintiff again denied violating any policy with respect to this account.[2]

Another alleged policy violation noted in the June 9 report involved plaintiff's request for a bank employee to monitor one of her accounts for overdrafts. Plaintiff denied doing anything other than requesting "a heads up" if a check bounced on the account, a courtesy generally afforded to employees.

On June 22, 2011, Salamone authored a hand-written note to human resources, stating he no longer had confidence in plaintiff's leadership, and could

---

[2] Defendants also took issue with plaintiff's niece working under plaintiff, and receiving special favors as a result.

not trust that she would put the interests of the bank before her own. Therefore, he had "changed" her responsibilities, such that she would work in the human resources department, overseeing training, and report to Nettleton.

Lee told Salamone the transfer "would be considered a demotion" and was unwise, given the nature of plaintiff's and Nettleton's personalities.[3] Lee also warned Salamone that plaintiff would "take this very badly, and that she would consider it discriminatory, and that the bank would be facing a lawsuit."

In pretrial discovery, defendants took the position that plaintiff's change in job responsibilities constituted a disciplinary action. Lee also testified that when Salamone spoke to him about the proposed transfer, Salamone presented it as a disciplinary action.

At trial, however, defendants denied that plaintiff's transfer constituted a disciplinary action or demotion because plaintiff retained her title and maintained her salary. They claimed the transfer represented "an opportunity" for plaintiff to redeem herself and take charge of an expanded, company-wide training program.

---

[3] According to Lee, Nettleton is "an extremely confrontational, outspoken, aggressive person. One of his favorite comments is he likes to shoot first and aim later."

A-4438-16T1

On June 30, 2011, Salamone and Nettleton met with plaintiff to address the issues raised in the Ford ethics report. When plaintiff continued to deny any wrongdoing, the meeting became heated. Salamone told plaintiff she expected people to make exceptions and violate policies to make things easier for her. He also said she was a poor leader, was high maintenance, and intimidated her staff. Finally, he told her he did not trust her to put the bank's interests ahead of her own, and because Lee had been protecting her, he needed to separate them and move her to human resources.

According to plaintiff, she left the meeting distraught and humiliated, believing her career was over. On July 21, 2011, plaintiff submitted a memo to Salamone, copying Lee and Nettleton, defending her actions, denying any wrongdoing, and opposing her "punishment." She testified that her new position constituted a demotion because she would have fewer people report to her and would not have the same chance for promotion to Senior Vice President. Plaintiff ended the memo with the following statement:

> There appears to be an underlying agenda that can only make me think that this is a discriminatory action against me. I believe that these accusations and the unfair depth of punishment were instituted because of my request for a promotion. I can only believe that the plan was to either fire me or get me so [humiliated] that I would quit my employment with the bank. After [thirty-six] years of loyalty, accomplishments and high

A-4438-16T1

performance to have to deal with such adverse, discriminatory and unfair conditions is just disturbing.

Plaintiff later complained of discrimination to Chaves. Chaves responded he had "nothing to do with this," explaining that Salamone was telling Nettleton what to do.

Lee understood plaintiff was alleging discrimination and believed the allegation warranted investigation. Nevertheless, defendants contended the memo did not constitute a valid complaint of discrimination and therefore did not require an investigation.

Salamone believed plaintiff's allegation constituted "words that didn't mean anything" and there was "absolutely no abuse . . . or discrimination in the investigation or in any of the actions" taken with respect to plaintiff. He testified human resources employees knew "all the right words" to use.

A day later, Salamone emailed Nettleton: "this changes how I think we go forward. It looks like there is no hope for her." He questioned "whether [he] should have fired her . . . because it was clear that she only wanted to work for Mike Lee and she would not accept anything else."

On July 27, 2011, Salamone responded to plaintiff by email, with an attached memo, which stated

11

> Hudson has not, and will never discriminate against any employee for any reason. One needs to look no further than the composition of our Executive Vice Presidents, Senior Vice-Presidents and First Vice-Presidents, which is a diverse group representative of our community. Equally spurious is your suggestion that a request for promotion may have spurred the bank's actions.

Salamone also wrote a memo to human resources, which added information about his June 30, 2011 meeting with plaintiff, and plaintiff's July 21, 2011 memo. Salamone stated, "My conclusions are only reinforced by Mrs. Mallon's continued inability to recognize and accept responsibility for her highly inappropriate actions. Mrs. Mallon never raised any claim of discrimination."

Salamone testified the last sentence referred to plaintiff's failure to raise any claim of discrimination. She only mentioned discrimination on July 21, which he characterized as "a desperate attempt to work again with Mike Lee."

In an earlier draft of his memo, which he sent to DiMari and Nettleton, Salamone stated: "My conclusions are only reinforced by this email and the accusations of 'abusive action' and 'discrimination' raise this issue to a deeper question as to whether Mrs. Mallon should continue to be employed at Hudson City."

Salamone was concerned with plaintiff's continued refusal to accept responsibility, and "thought it preposterous, to keep going on with this." He

believed her claim of discrimination was uncalled for because the ethics investigation had been fair, and he never received a request for her to be promoted. He questioned whether she should keep working at the bank.

On August 3, 2011, plaintiff sent a memo to Salamone, again denying any violations of bank policies. Salamone forwarded plaintiff's memo to Nettleton, indicating he should share the memo with counsel.

Salamone intended plaintiff's transfer to human resources to take effect on July 1, 2011. However, Nettleton acknowledged a period of transition during the month of July. During this transition period, Nettleton and DiMari attempted to engage plaintiff in her new position; however, plaintiff refused to report to Nettleton, insisting he was not her superior, and accused him of being a liar and having been "bought."

On August 4, 2011, plaintiff met with Nettleton and DiMari regarding her new position and office. According to plaintiff, Nettleton was "[c]onfrontational, argumentative, pushy, arrogant, bullying, [and] abusive," telling her to email him every day because he did not trust her.

In August 2011, while Nettleton was on vacation, he and DiMari co-authored a memo regarding the August 4 meeting. Nettleton wrote that he found plaintiff "contentious, confrontational, and insubordinate" and that he told

13

plaintiff she "already had 'two strikes against her'", and "if her behavior continued to be negative it would lead to discipline and possible termination."

Nettleton also wrote a memo to plaintiff, responding to her request for information regarding the Ford ethics complaint. Nettleton stated that although plaintiff had the ability to perform, he had "concerns" regarding her "commitment," and was "disappointed by the most recent incident of [her] insubordinate behavior that resulted in [his] verbal warning."

DiMari later learned plaintiff approved excessive tuition reimbursements for her subordinates, including plaintiff's own niece, in violation of the bank's education assistance policy. Also, while plaintiff was on vacation, one of her subordinates indicated their failure to meet a deadline. DiMari and Nettleton drafted another memo, documenting plaintiff's failure to fulfill her job responsibilities, and the violation of company policy.

On September 7, 2011, plaintiff, DiMari, and Nettleton had another contentious meeting. Nettleton raised the tuition reimbursement irregularities, which plaintiff denied. Plaintiff claimed Nettleton told her to retire. He admitted calling plaintiff the worst employee he ever had.

That afternoon, Nettleton told plaintiff she was being suspended. According to plaintiff, she told Nettleton she was being discriminated against, and he laughed at her.

On September 8, 2011, Nettleton and DiMari documented the previous day's meeting. According to the memo, plaintiff "was angry and insubordinate" and called Nettleton "a bully and a liar" who "constantly berates her and puts her down." She accused Nettleton of "discrimination and disparate treatment" because he demanded a daily email from her regarding her work.

On September 15, 2011, Hudson City terminated plaintiff's employment. Plaintiff once more alleged discrimination. Again, the discrimination allegation was not investigated. Defendants claimed plaintiff was terminated because of multiple violations of bank policies, her failure to accept responsibility for those violations, and her insubordination in refusing to work in her new position.

On December 19, 2011, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging age and sex discrimination. In January 2013, plaintiff filed a Law Division complaint alleging claims of gender and age discrimination, retaliation, and aiding and abetting liability, under the LAD, as well as a claim for violation of New Jersey's

Equal Pay Act, N.J.S.A. 34:11-56.1 to -56.14. The parties later stipulated to the dismissal of the age discrimination and equal pay claims.

The matter proceeded to a jury trial in spring 2016. At the close of plaintiff's case, defendants moved for dismissal pursuant to Rule 4:37-2(b). The court dismissed plaintiff's claims for punitive damages and future emotional distress damages, but denied the remainder of defendants' motion. Defendants again moved for dismissal at the close of all evidence, which the court denied.

The jury returned a verdict in favor of plaintiff on her retaliation claim and the aiding and abetting claim, but found against plaintiff on her gender discrimination claim. The jury awarded plaintiff $733,000 for past economic loss and $202,000 for future economic loss, but nothing for emotional distress. Plaintiff's counsel requested the court to reconsider its dismissal of the punitive damages claim, which the court denied.

Defendants then moved for judgment notwithstanding the verdict, or alternatively a new trial. The court denied the motion.

Meanwhile, plaintiff filed a motion for attorney's fees, costs, prejudgment interest, and a tax gross-up to account for the negative tax consequences caused by receiving the economic award in a lump sum. The court awarded plaintiff $491,227.37 in counsel fees, $75,231.60 in costs, and $62,955.64 in

prejudgment interest, but denied her request for a tax gross-up. Plaintiff filed a motion for reconsideration regarding the fee award, which the court denied. This appeal followed.

II.

Defendants argue plaintiff did not prove she engaged in protected conduct under the LAD and therefore could not prove the retaliation claim. We disagree.

When reviewing the denial of a motion for judgment, we apply the same standard as the trial court. We will deny a motion for judgment "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). We grant the motion only "where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

The LAD prohibits retaliation against individuals who complain of unlawful discrimination. See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 546 (2013); Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 125 (2008). To prove a claim of retaliation, a plaintiff must establish: (1) he or she engaged in a protected activity known to the employer, such as making a good faith complaint of unlawful discrimination; (2) an adverse employment action; and

(3) causation. Battaglia, 214 N.J. at 547; Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 372-73 (2007).

Defendants claim plaintiff failed to prove the first element of her retaliation claim. As to this element, "[a]s a starting point, protected activity, if involving a complaint, must concern discrimination." Dunkley v. S. Coraluzzo Petrol. Transporters, 437 N.J. Super. 366, 377 (App. Div. 2014), remanded on other grounds, 221 N.J. 217 (2015). "A general complaint of unfair treatment" will not suffice. Ibid. (quoting Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)).

At the same time, our case law cautions against a narrow reading of the LAD's protections. Battaglia, 214 N.J. at 551. Thus, there are no magic words for expressing a complaint of discrimination. Cf., Beasley v. Passaic Cty., 377 N.J. Super. 585, 605 (App. Div. 2005). "[A]s long as the complaint is made in a good faith belief that the conduct complained of violates the LAD, it suffices for purposes of pursuing a cause of action." Ibid.

Here, the record supports the jury's conclusions that plaintiff had a good faith belief in her complaint of unlawful discrimination and defendants understood plaintiff's complaint related to an alleged violation of the LAD. Plaintiff regularly complained to Lee, a senior bank executive, about gender

18                                                                          A-4438-16T1

discrimination at the bank and a glass ceiling that prevented women from reaching top levels of management. Moreover, plaintiff spoke with Lee about a promotion to Senior Vice President. In the same time-frame, Lee discussed plaintiff's possible promotion with Salamone. Thus, the jury could reasonably conclude that plaintiff's discrimination claim was not contrived in response to the March 2011 ethics complaint made against her, as defendants argued.

As to the nature of plaintiff's complaint, Lee testified he advised Salamone against transferring plaintiff to human resources, stating she would find the transfer discriminatory, and likely file a lawsuit. Thereafter, when plaintiff wrote to Salamone complaining of discrimination, Salamone responded by stating the bank does not discriminate against its employees, and noting the diversity of the bank's senior management.

Both Lee's advice to Salamone to expect a lawsuit alleging discrimination, and Salamone's response, which invoked diversity, show defendants understood plaintiff's July 2011 memo to Salamone alleged discrimination in violation of the LAD, and not merely a complaint of unfair treatment.

Defendants dismissed plaintiff's allegation, apparently in the belief it lacked merit. However, Salamone's dismissiveness towards other allegations of discrimination, made by human resources employees because they knew "all the

right words," is consistent with a conclusion that defendants would have rejected any discrimination complaint made by plaintiff, regardless of the specific words used.

Defendants next argue for a new trial on the retaliation claim, asserting errors in the jury charge and the verdict sheet. Defendants argue the instructions and verdict sheet were erroneous because they referenced only "discrimination" complaints generally, and thereby permitted the jury to find for plaintiff without finding she made a complaint of gender-based discrimination. Moreover, defendants claim the court made similar errors in responding to the jury's question on this subject.

Defendants' proposed retaliation charge did not follow the relevant model charge. It was longer, and inserted the words "gender" or "gender discrimination" any time it referred to a complaint made by plaintiff.

The questions in defendants' proposed verdict sheet regarding the retaliation claim also added the word "gender" every time they referenced a complaint of discrimination.

During deliberations, the jurors posed three questions to the court:

1) Could you give us a definition of discrimination?

2) Is there a difference in gender discrimination than just discrimination?

3) Are we allowed to consider that . . . there might have been a discrimination not . . . necessarily gender discrimination?

After discussing the questions with counsel, the judge provided the jury with the following responses:

Question #1:

Discrimination can be generally defined as treating someone differently. However, the LAD statute is more specific and makes it unlawful to treat someone differently because of, among the various categories, their race, creed, national origin, color, or sex. LAD specifically prohibits an employer from taking an adverse action against their employee based on "differential treatment" that is premised on the sex or the gender of a person. If proven, this "differential treatment" would be considered an adverse employment action, which is prohibited by LAD.

Question #2:

Yes.

Question #3:

This question cannot be answered as phrased. Please rephrase if you still wish guidance or clarification.

The court's concern with respect to question three was that the answer could differ depending upon whether the jury was considering the gender discrimination claim, or the claim for retaliation. With the gender discrimination claim, the jurors could not consider whether plaintiff was

21

discriminated against based upon any other protected characteristic. However, with the retaliation claim, the jurors could consider her discrimination complaint a protected activity if based upon, or perceived by defendants as based upon, any protected characteristic under the LAD, not limited to gender. The jurors chose not to rephrase question three.

When reviewing a trial court's instructions, we consider the charge as a whole. Sons of Thunder v. Borden, Inc., 148 N.J. 396, 418 (1997). We "will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Wade v. Kessler Inst., 172 N.J. 327, 341 (1996) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)).

We also apply the same standard when evaluating jury interrogatories or a verdict sheet. Ibid. (citing Mogull v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 467–68 (2000)). We will not reverse "unless they were misleading, confusing, or ambiguous." Sons of Thunder, 148 N.J. at 418.

A charge that closely follows the model charge will rarely result in a finding of error. Mogull, 162 N.J. at 466. However, the failure to tailor a charge to the facts of a case may warrant reversal if it results in an incorrect charge, or

a charge that does not adequately guide the jury in how to apply the legal principles to the facts. Reynolds v. Gonzalez, 172 N.J. 266, 288-89, 291 (2002).

Here, the jury instructions complied with the law in discussing the retaliation claim, and closely followed Model Jury Charge (Civil), 2.22 Unlawful Employment Practices Under the New Jersey Law Against Discrimination (LAD) – Retaliation (N.J.S.A. 10:5-12(d) and -12(r)) (Approved Sept. 2009; rev. Jan. 2019). The verdict sheet also complied with the governing law, as did the responses to the jurors' questions.

The jurors received accurate instructions as to the nature of plaintiff's allegations. They were instructed that plaintiff was alleging gender discrimination in the failure to promote her to Senior Vice President, and retaliation in response to her complaint of gender discrimination. Moreover, the judge accurately instructed the jurors that to find for plaintiff on the retaliation claim, they must find plaintiff made a protected claim of discrimination under the LAD, and not merely a complaint of unfair treatment. Dunkley, 437 N.J. Super. at 377.

The court did not err in rejecting defendants' proposed jury charge on retaliation. The court reasonably concluded the proposed charge would mislead the jurors into believing plaintiff needed to utter the words "gender

discrimination" for her discrimination complaint to constitute protected activity under the LAD; however, the law imposes no such obligation. Battaglia, 214 N.J. at 548-49, 551.

Third, defendants argue the court erred in admitting into evidence three documents protected by the attorney-client privilege. We review the applicability of the attorney-client privilege de novo. Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013).

"New Jersey's discovery rules are to be construed liberally in favor of broad pretrial discovery." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997). However, privileged documents and communications are not discoverable. R. 4:10-2(a).

The attorney-client privilege protects "communications between a lawyer and his client in the course of that relationship and in professional confidence . . . ." N.J.R.E. 504(1). It applies to communications "(1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and [where] the communication is made in confidence, (4) by the client." Hedden, 434 N.J. Super. at 10.

The privilege also applies to documents prepared at the request of the attorney to aid in providing legal advice or to prepare for litigation. Hannan v.

St. Joseph's Hosp. & Med. Ctr., 318 N.J. Super. 22, 27-29 (App. Div. 1999). The privilege may apply to communications between a client and intermediaries or agents of an attorney. Rivard v. Am. Home Prods., Inc., 391 N.J. Super. 129, 154 (App. Div. 2007); O'Boyle v. Borough of Longport, 218 N.J. 168, 185 (2014).

The term "client" includes a "corporation or other association that . . . consults a lawyer . . . for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity. . . ." N.J.R.E. 504(3). "The privilege . . . belongs to the institution and covers confidential communications between the entity's attorneys and its employees." Hedden, 434 N.J. Super. at 11. Moreover, "[e]-mail exchanges are covered by the privilege like any other form of communication." Stengart v. Loving Care Agency, Inc., 201 N.J. 300, 315 (2010).

During discovery, defendants produced a log of documents they claimed were protected under attorney-client or work product privilege. Plaintiff moved to compel documents identified in the privilege log. The court denied plaintiff's motion, but ordered defendant to produce a more descriptive privilege log.

In March 2015, plaintiff again moved to compel discovery. After an in camera review of the disputed documents, the court ordered defendants to produce certain items.

Defendants first contend the court erred in admitting Exhibit P-109, which consists of an email from Salamone to Nettleton and DiMari, with an attached three-page draft memo written by Salamone to human resources. In the memo, Salamone summarizes his thoughts regarding the Ford ethics complaint investigation, and questions whether the bank should continue to employ plaintiff.

The memo is mostly a typewritten version of Salamone's handwritten notes dated June 22, 2011, which were admitted into evidence as Exhibit P-106. However, on appeal, defendants do not complain about the admission of P-106. They also do not complain about the admission of Exhibit P-118 – the final version of the memo.

In Exhibit P-109, Salamone references plaintiff's July 21, 2011 memo, in which she complained of discrimination. Salamone stated, "My conclusions are only reinforced by this email and the accusations of 'abusive action' and 'discrimination' raise this issue to a deeper question as to whether Mrs. Mallon should continue to be employed at Hudson City."

A-4438-16T1

However, in the final version of the memo (P-118), Salamone states: "My conclusions are only reinforced by Mrs. Mallon's continued inability to recognize and accept responsibility for her highly inappropriate actions. Mrs. Mallon never raised any claim of discrimination."

Here, the record supports the conclusion that Exhibit P-109 was not protected by the attorney-client privilege. Salamone addressed the memo to human resources, and, as explained in both Salamone's deposition and his trial testimony, the memo documents Salamone's thoughts regarding the Ford ethics complaint investigation, and his plan as to how to proceed going forward.

Defendants also contend the question contained in the memo – whether the bank should continue to employ plaintiff – was a question posed to counsel. However, the record does not support this contention. Nothing in the record indicates that Exhibit P-109 was intended as an attorney-client communication, or was prepared at the request of counsel to assist counsel in providing legal advice or prepare for litigation. Hannan, 318 N.J. Super. at 27-29. Further, Salamone did not testify that the question posed in his memo to human resources was directed to defendants' counsel.

Defendants next contend the trial court erred in admitting Exhibit P-115 over their objection of attorney-client privilege. Exhibit P-115 consists of a

27

cover email from Salamone to Nettleton and DiMari, stating: "Here is the final with a minor change in blue. Please send this back to me in 'final' so the various changes are not visible or attainable." The attached memo is from Salamone to plaintiff, responding to her July 21, 2011 memo; it is in draft form, with strikeouts and additions noted.

Plaintiff's counsel referenced this document in his opening statement, arguing it showed Salamone "doesn't want anybody to know how this evolved. He wants it to go – be gone and only the final be available, but that didn't happen." Plaintiff's counsel made a similar argument in summation. Defense counsel objected to plaintiff's counsel's comments, and moved for a mistrial, arguing that confidential communications between client and counsel had been presented to the jury.

The record supports the trial court's conclusion that Exhibit P-115 is not protected by the attorney-client privilege under N.J.R.E. 504(1). Exhibit P-115 does not constitute a communication between attorney and client. It consists solely of an email communication among Salamone, Nettleton, and DiMari, without any reference to any communication with counsel; and a draft memo from Salamone to plaintiff, without any reference to communication with counsel. The mere fact that the draft memo may have been sent to counsel does

not make it privileged.  K.L. v. Evesham Twp. Bd. of Educ., 423 N.J. Super. 337, 351 (App. Div. 2011).

Defendants also contend Exhibit P-122 is protected by the attorney-client privilege.  Exhibit P-122 consists of a string of two emails sent on August 3, 2011.  In the first email, plaintiff forwards a memo to Salamone, responding to his July 27 memo.  In the second email, Salamone forwards plaintiff's email to Nettleton and states:  "Chris, [s]he doesn't want this to end.  You may want to share this with David Jasinski and get his advice.  Sandy must have forgotten that she signed the Insider Trading Violation memo."

As above, Exhibit P-122 is not protected because it does not reflect any attorney-client communication.  Salamone's mere reference to seeking advice from counsel in the future does not make the communication privileged.

Finally, defendants argue that the court erred by not responding to a juror's question regarding attorney-client privilege.  Following Salamone's testimony, one juror sent a note to the court, proposing that the following questions be posed to Salamone:  "What is attorney-client privilege?" and "When can this privilege be revoked?"  The court declined to pose these questions to Salamone, but reminded the jurors they would be instructed on the law pertaining to the issues in the case.

A-4438-16T1

The court appropriately handled the juror's question. The juror was not entitled to pose a question to Salamone that called for a legal opinion, nor was the juror entitled to question the court's legal rulings as to the admissibility of evidence. The court must instruct the jury on the law. During the jury charge, the court correctly instructed the jurors to make their factual determinations based upon the evidence admitted by the court. Therefore, we reject defendants' argument that the judgment should be reversed due to the erroneous admission of privileged documents.

Defendants also assert a number of errors they claim cumulatively warrant reversal for a new trial. Defendants claim plaintiff's counsel argued defendants attempted to bury evidence, knowing defendants could not respond without waiving the attorney-client privilege. Defendants also argue plaintiff's counsel inappropriately questioned defendants' racial and ethnic bias, despite the lack of relevance. Defendants further argue plaintiff's counsel improperly attacked defense counsel through the use of privileged documents. Defendants' final argument is that plaintiff's counsel improperly asked the jury to make a negative inference about the bank's failure to produce certain evidence.

None of the complained of errors, individually or together, warrant reversal of the judgment. They largely repeat arguments made and addressed

A-4438-16T1

earlier in this opinion or were simply not raised in the trial court, and are therefore waived. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Regarding any arguments not specifically addressed, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

III.

In plaintiff's cross-appeal, she argues the court erred in dismissing her claim for punitive damages. We apply the same standard as the trial court, and determine "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). "The motion should only 'be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action.'" Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

Under the Punitive Damages Act, N.J.S.A. 2A:15-5.12:

> a. Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

Actual malice is defined as "an intentional wrongdoing in the sense of an evil-minded act." N.J.S.A. 2A:15-5.10. "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. 2A:15-5.10.

In LAD cases, there are two prerequisites for the imposition of punitive damages: proof of actual participation by upper management, or willful indifference; and proof that the conduct was especially egregious. Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 274 (2010); Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113 (1999); Rendine v. Pantzer, 141 N.J. 292, 313–14 (1995); Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 624-25 (1993). The only relevant question in this case concerns whether the conduct was especially egregious.

The "difficult and fact-sensitive" concept of egregiousness "does not lend itself to neat or precise definitions . . . ." Quinlan, 204 N.J. at 274-75. But, the standard will be satisfied if plaintiff proves intentional wrongdoing, a wanton and willful disregard for plaintiff's rights, or that defendants acted with actual malice. Id. at 274.

Viewing the evidence in the light most favorable to plaintiff, she proved that upon receiving the memo alleging discrimination in July 2011, Salamone

questioned whether plaintiff should remain employed by the bank. Thereafter, defendants continued with their plan of transferring plaintiff to a position in human resources, micromanaging her, and ultimately terminating her employment. The record amply supports her claim of retaliation, including significant hostility directed towards her by certain high level Hudson City decision makers.

On the other hand, defendants' investigation of plaintiff originated in March 2011, with the Ford ethics complaint, four months before plaintiff made her July 2011 complaint of discrimination. The investigation may have been flawed and inadequate; however, nothing in the record suggests the Ford ethics complaint was contrived. Moreover, it is undisputed that plaintiff dismissed their concerns regarding her conduct, thereby provoking some of the acrimonious interactions with Salamone, Nettleton, and others. Also, the decision to transfer plaintiff occurred before she made her discrimination complaint.

Considered as a whole, the record does not show, by clear and convincing evidence, defendants acted in an especially egregious manner, warranting an award of punitive damages. Therefore, we affirm the court's dismissal of plaintiff's punitive damages claim.

Plaintiff also argues the court erred in not admitting testimony from her statistical expert regarding her gender discrimination claim. She requests a new trial, but only "if, in the unlikely circumstance, this Court remands for a new trial on [p]laintiff's retaliation claim." Since we do not remand this case for a new trial on the retaliation claim, we need not address this argument.

Plaintiff and amicus also contend the court made numerous legal and factual errors in its decision on plaintiff's fee application. Plaintiff submitted multiple certifications in support of her motion for counsel fees and costs. She requested a lodestar of $1,114,470.50, plus a fifty percent fee enhancement ($557,235.25), for a total of $1,671.705.75. She also sought costs in the amount of $150,463.21.

Defendants also submitted certifications. Most significantly, they requested a reduction of $442,446 in counsel fees, for any time not spent on the successful retaliation claim. Defendants also sought a fifty percent reduction in trial costs to account for time not associated with the retaliation claim, a reduction for the cost of depositions not connected with the retaliation claim, and a fifty percent reduction of legal research costs to reflect plaintiff's limited success.

In addition, defendants sought: (1) a $38,667.75 reduction for excessive time devoted to certain tasks; (2) a reduction for the fees and costs associated with a mock trial ($21,374.50 in fees, plus $31,258.41 in costs); (3) disallowing $8,167.75 in entries that were vague; (4) disallowing $4,844 in fees connected to plaintiff's spoliation of evidence; (5) disallowing $31,404 in fees and costs, including motion practice, associated with an expert who did not testify; (6) disallowing $35,502.91 in fees and costs associated with other unsuccessful motions; (7) disallowing $14,303.72 in fees associated with having two people in attendance for depositions; (8) disallowing $28,832.50 in excessive fees associated with having multiple attorneys and a paralegal present at trial; (9) disallowing $41,126.15 in costs; (10) disallowing $579.02 for the cost of lunches during trial; and (11) disallowing $2,941.40 in costs associated with serving subpoenas on witnesses not called to testify.

We review the counsel fee award for an abuse of discretion. Occhifinto v. Olivo Constr. Co., 221 N.J. 443, 453 (2015); Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 619 (2011). "Fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine, 141 N.J. at 317.

A-4438-16T1

The LAD provides that prevailing parties may be awarded reasonable counsel fees and costs. N.J.S.A. 10:5-27.1. However, under Rule 4:42-9(b), parties seeking a fee award must submit an affidavit of services addressing:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]
>
> (8) whether the fee is fixed or contingent.
>
> [R.P.C. 1.5(a).]

The starting point for a counsel fee award is the "lodestar" amount, or the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Walker v. Giuffre, 209 N.J. 124, 130 (2012); Rendine,

141 N.J. at 334-35. The court's determination of the lodestar "requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Rendine, 141 N.J. at 335.

There is no requirement of proportionality between damage recoveries and counsel fee awards. Id. at 336. Nevertheless, the court may reduce the lodestar by hours not reasonably expended, if the hours exceed those competent counsel reasonably would have expended to obtain a similar result. Ibid.

> Similarly, a trial court should reduce the lodestar fee if the level of success achieved in the litigation is limited as compared to the relief sought. If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.
>
> [Ibid. (citing Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)); see, e.g., Scales v. J.C. Bradford & Co., 925 F.2d 901, 910 (6th Cir.1991).]

Thus, a trial court should exclude "hours devoted to claims that are entirely distinct from the relevant successful claims." Singer v. State, 95 N.J. 487, 500 (1984). However, "if a plaintiff's unsuccessful claims are related to the successful claims, either by a 'common core of facts' or 'related legal

37

theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated." Ibid.

Plaintiff argues the court erred in reducing her fee application by $442,446 for time not related to her successful retaliation claim, since her claims were legally and factually intertwined. She also argues the hours spent on the matter were reasonable in light of the overall success of the litigation, with plaintiff receiving an award of $935,000 as compared to the negligible settlement offer made by defendants.

We agree that the retaliation claim was factually intertwined with her other, unsuccessful claims. To prove the retaliation claim, plaintiff needed to establish the good faith nature of her complaint of gender discrimination and overcome defendants' claim that they decided to terminate her employment for a legitimate, non-retaliatory reason. Thus, both the successful and unsuccessful claims revolved around a common core of facts. See Kluczyk v. Tropicana Prods., Inc., 368 N.J. Super. 479, 499-500 (App. Div. 2004).

Where the claims are intertwined, "a court should not attempt to identify specific hours spent on related, but unsuccessful claims and exclude them from the lodestar." Blakey v. Cont'l Airlines, Inc., 2 F. Supp. 2d 598, 606 (D.N.J.

1998).  Instead, the court should "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  Ibid.

Thus, in this case, the court erred when it reduced the fee award to eliminate all charges unrelated to the retaliation claim.  That reduction amounted to $442,446, or forty percent of the requested lodestar.  Instead, the court should have made an overall assessment of the reasonableness of the fee award based upon plaintiff's overall success.  New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 185 N.J. 137, 153-55 (2005); Chakravarti v. Pegasus Consulting Grp., Inc., 393 N.J. Super. 203, 211-12 (App. Div. 2007).

In her amended complaint, plaintiff sought damages for her losses, with the damages she sought virtually identical for each of her claims, regardless of the legal theory.  The jury awarded plaintiff $935,000.  However, this was substantially less than she sought at trial, as her economic expert testified that her losses amounted to either $1,400,000, or $2,680,967, depending upon whether she became Senior Vice President.  In addition, the jury did not award plaintiff any emotional distress damages, and the court dismissed her claim for punitive damages.  Therefore, a reduction of the lodestar was still appropriate

based upon plaintiff's overall level of success.  <u>Silva v. Autos of Amboy, Inc.</u>, 267 N.J. Super. 546, 556 (App. Div. 1993).

In ruling on the appropriate lodestar, the court considered the factors set forth in R.P.C. 1.5.  In light of the court's findings as to reasonableness, we affirm the court's reduction of the lodestar by $442,446.  Although the court identified this reduction as "for time that is not related to the successful claim of retaliation," the reduction was consistent with plaintiff's overall success in the litigation.[4]

Plaintiff next argues that the court erred by: (1) deducting $17,360.91 in counsel fees for time spent on the deposition of David Jasinski, defendant's counsel; (2) deducting $3949.50 in counsel fees for time spent on an unsuccessful motion to inspect the bank's computer, and $2006 for an unsuccessful motion to compel discovery; (3) deducting $31,404 in counsel fees relating to plaintiff's statistical expert; (4) deducting $14,303.72 for the attendance of a paralegal at depositions; (5) deducting $28,832.50 in fees relating to the attendance of a paralegal at trial, in addition to two attorneys; (6)

---

[4]  Because our analysis diverges from the trial judge, we note that "we review orders and not, strictly speaking, reasons that support them . . . . [A] correct result, even if predicated on an erroneous basis in fact or in law, will not be overturned on appeal." <u>El-Sioufi v. St. Peter's Univ. Hosp.</u>, 382 N.J. Super. 145, 169 (App. Div. 2005).

A-4438-16T1

reducing the lodestar by $38,667.75 for excessive time spent on normal litigation tasks such as preparing for a deposition and drafting deficiency letters; (7) deducting $21,374.50 in fees for time spent on a mock trial; and (8) double-counting $33,103.50 in fee deductions by (a) allowing a reduction of $38,667.75 for excessiveness, notwithstanding that plaintiff adjusted her fee request by $18,480 and $623.50 to account for errors in her initial application, and (b) allowing a reduction for $442,446 for time spent on claims unrelated to the retaliation claim, which included $14,000 in paralegal time at depositions, which the court also made as an additional deduction.

Most of these deductions are permissible under the legal standard previously discussed. Trial courts should "consider the extent to which a party's discovery posture has caused any excess expense to be incurred," Szczepanski v. Newcomb Medical Center, 141 N.J. 346, 366 (1995), and the court did so here, finding the case was over-litigated by both sides. Moreover, the court did not err in eliminating fees relating to the statistical expert who was precluded from testifying at trial.

However, we must reverse a few deductions. First, the court erred in deducting fees for the Jasinski deposition. The court ordered that Jasinski appear for a deposition related to his role in the Ford investigation. Since

Jasinski's deposition was court-ordered, and related to defendants' conflicting positions during discovery, it is unfair to deny plaintiff fees relating to that deposition, even though Jasinski was not disqualified. <u>Saffos v. Avaya Inc.</u>, 419 N.J. Super. 244, 275 (App. Div. 2011).

However, while plaintiff characterizes the court's $17,360.91 deduction as the cost of Jasinski's deposition, the court characterized that deduction as "time billed in an unsuccessful attempt to disqualify defense counsel David Jasinski, Esq." Therefore, the record is unclear as to what monetary adjustment should be made, and we remand for resolution of that issue.

Second, we reverse $33,103.50 in deductions, which represent double-counted deductions.

Plaintiff lastly argues the court erred in arbitrarily reducing her request for costs by fifty percent. Plaintiff requested costs of $150,463.21, which defendants opposed, and the court awarded costs of $75,231.60.

The award of costs is consistent with the law set forth above, and the court's evaluation of the reasonableness of plaintiff's request in light of her limited success. Notably, more than forty percent of the court's reduction ($31,258.41) was attributable to the mock trial plaintiff's counsel conducted.

The court rejected the mock trial as excessive, and denied counsel fees for the mock trial as well.

Thus, we affirm the trial court's ruling on plaintiff's request for counsel fees and costs, except we remand to eliminate any deduction for counsel fees and costs associated with the court-ordered Jasinski deposition, and to eliminate $33,103.50 in double-counted deductions.

Plaintiff and amicus next argue that the court erred in denying her a contingency fee enhancement of the lodestar. In her fee application, plaintiff requested a fifty percent fee enhancement – $557,235.25. The court noted "the ability of a party to pay an award of counsel fees is inherent in the concept of analyzing what is a reasonable fee." The court also found that "[p]laintiff's request for a 50% fee enhancement is not reasonable," noting that "[t]he United States Supreme Court applies a strong presumption against fee enhancements, requiring the party seeking same to prove with specificity why an enhancement is justified," citing Perdue v. Kenny A., 559 U.S. 542, 546 (2010).

Ultimately, the court rejected plaintiff's request "because [p]laintiff did not accept a substantially contingent fee arrangement," and "[t]he agreement between [p]laintiff and counsel mitigated the risks of nonpayment," as did plaintiff's request for substantial damages. Specifically, the court found that

plaintiff had paid her counsel $52,500 in fees and $104,981.11 in costs, and remains responsible for the remainder of costs in the amount of $41,772.33 pursuant to the fee agreement.

The court further found that plaintiff's counsel incurred little economic risk, and did not lose business or clients as a result of this matter, since the case involved routine claims, as to which plaintiff's counsel was confident of success, and before trial the case was handled mostly by an associate at plaintiff's counsel's firm. Moreover, the court found that plaintiff's settlement demand of $2.6 million (inclusive of counsel fees and costs) was unreasonable in light of the $935,000 jury award.

Rendine, holds that, after determining the lodestar, the trial court "should consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." 141 N.J. at 337. Counsel fees "awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." Id. at 338. To determine if a contingency fee enhancement is appropriate, the court must determine if the case was taken on a contingent basis;

44

whether the attorney was able to mitigate the risk of nonpayment; and whether other economic risks were aggravated by the contingency of payment. Id. at 339.

"[A]ttorneys who are paid a portion of their reasonable hourly fee irrespective of result have partially mitigated the risk of nonpayment." Id. at 340. Also, an attorney seeking substantial damages in a contingency fee setting has reduced his or her risk of nonpayment. Ibid. However, a risk of nonpayment may remain substantial due to "specific problems of proof and the hazards inherent in all litigation." Ibid. Thus, the court may consider the overall strength of the case when determining whether to award a contingency fee enhancement. Id. at 340-41.

"[Contingency] enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." Id. at 343. However, there is no requirement that a fee enhancement be awarded in every case. Saffos, 419 N.J. Super. at 277; Gallo v. Salesian Soc'y, Inc., 290 N.J. Super. 616, 660 (App. Div. 1996).

Here, the trial court began its analysis with a misunderstanding of the applicable law and the relevant factors to consider. Although the court

addressed some of the factors set forth in <u>Rendine</u>, it erred in several respects. First, contrary to the court's finding, the retainer agreement set forth a primarily contingency fee arrangement. Plaintiff was responsible for the payment of costs, but her payments were capped at $50,000, and were subject to a partial credit if the case resolved before trial. Thus, there was little mitigation of the risk of non-payment in the fee arrangement, particularly in light of the extensiveness of this litigation, which, the court noted, was characterized by "heightened discord and confrontations." <u>Rendine</u>, 141 N.J. at 339-41.

In addition, the court relied upon plaintiff's counsel's pretrial posturing regarding the strength of plaintiff's case. Instead, the court should have relied upon its own analysis of the strength of the case, as well as any difficulties plaintiff experienced in achieving a favorable verdict. <u>Id.</u> at 340-41.

The trial court also erred to the extent it believed "the ability of a party to pay an award of counsel fees" was relevant to its analysis. This is not a factor recognized by our Supreme Court.

Finally, in concluding that plaintiff failed to mitigate the economic risk because she assumed an unreasonable settlement posture, the court noted only plaintiff's settlement demand of $2.6 million. The court failed to note that defendants made only one settlement offer, at the beginning of trial, for

46

$100,000. Arguably, defendants' settlement posture was just as unreasonable as plaintiff's. Based upon these legal misunderstandings and analytical errors, we remand to the trial court for a reassessment of the request for a contingency fee enhancement. Id. at 344.

Plaintiff and amicus next argue the court erred in denying her request for monies to offset the negative tax consequences of receiving the economic damages and lost wages as a lump sum, rather than over the course of the years they would have been earned. Plaintiff sought a tax gross-up award of $222,694, to account for the increase in taxes she would owe as a result of receiving a lump-sum award of $935,000 in economic damages, which would raise her federal and state income tax rate from 26.7% to 40.8%. She supported her request with an analysis performed by the forensic accountant who testified as her economic expert at trial. The expert testified that his analyses of plaintiff's lost income were gross numbers, and were not reduced for the taxes she would owe on an award. Similarly, in summation, plaintiff's counsel reminded the jury that any award for plaintiff's economic losses "is all taxable income."

In the jury charge on economic damages, the court did not give any instructions on the taxable nature of the award. The court mentioned taxes only in reference to discounting to determine the present value of future losses.

The court rejected plaintiff's request for a tax gross-up, finding no binding precedent to support such an award, and finding that plaintiff's request was inappropriate given her economic expert's trial testimony. In N.J.S.A. 10:5-3, the Legislature expressed its intent that "compensatory and punitive damages . . . be available to all persons protected by [the LAD] and that this act shall be liberally construed in combination with other protections available under the laws of this State."

Only one published case in New Jersey addresses whether a LAD plaintiff may receive an award to compensate for the negative tax consequences of a lump sum award of economic damages, and that case found such damages permissible. See Ferrante v. Sciaretta, 365 N.J. Super. 601 (Law. Div. 2003).

Likewise, we hold a trial court may issue an award to successful plaintiffs under the LAD, to offset the negative tax consequences the plaintiff would incur as a result of receiving economic damages in a lump sum award. However, the trial court did not err in failing to issue such an award under the circumstances presented in this case. Based upon the economic expert's testimony, plaintiff's counsel suggested in his closing argument that the jury should increase its award of economic damages because plaintiff would owe taxes on the award. We discern no basis for allowing plaintiff to both: (1) request from the jury a larger

economic damages award, to account for the taxes she will owe on the award; and (2) subsequently request that the court issue an award to account for the negative tax consequences of the jury's economic damages award. Therefore, we affirm the court's ruling denying a tax gross-up.

Affirmed in part, and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION