**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3963-17T1

JENNIFER L. SCHIAVONE,

      Plaintiff-Respondent,

v.

THE STATE OF NEW
JERSEY DEPARTMENT
OF CORRECTIONS,

      Defendant-Appellant.

_____

Argued December 11, 2019 – Decided December 26, 2019

Before Judges Haas, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0657-15.

James M. Duttera, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Deborah Ann Hay, Deputy Attorney General, on the briefs).

Andrew William Dwyer argued the cause for respondent (The Law Offices of Jeremy C. Rosenbaum and Dwyer & Barrett, LLC, attorneys; Jeremy C.

Rosenbaum and Andrew Dwyer, of counsel and on the brief).

PER CURIAM

Defendant Department of Corrections (DOC) appeals from a jury verdict awarding plaintiff Jennifer Schiavone $100,000 in emotional distress damages and $216,875 in punitive damages[1] on her claim that the DOC subjected her to a hostile work environment based on her gender in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. On appeal, the DOC contends the trial judge erred by: (1) denying its pre-trial motion for summary judgment and its motions at trial for a directed verdict based on the DOC's claim that plaintiff failed to establish the elements of a LAD claim, and because the DOC had proven an affirmative defense to plaintiff's cause of action; and (2) making several mistakes in his evidentiary rulings. Based upon our review of the record and applicable law, we affirm.

I.

Plaintiff began work for the DOC at the New Jersey State Prison (NJSP) in August 2011, first serving as a corrections officer recruit. The DOC promoted

---

[1] The trial judge also awarded plaintiff $585,014.35 in counsel fees and costs, and entered a judgment in favor of plaintiff reflecting a total award of $901,889.35.

A-3963-17T1

her to senior corrections officer in August 2012, and plaintiff retained that title through the trial. The DOC assigned plaintiff to the Central Control Unit (Central Control) in June or July 2013. This was considered a desirable position because, among other reasons, it did not involve direct interaction with inmates.

Throughout the course of plaintiff's employment, the DOC maintained a policy prohibiting discrimination in the workplace based on N.J.A.C. 4A:7-3.1. This policy was provided to all employees annually, and was available online, and posted in conspicuous work locations.

The policy provided that:

> employment discrimination or harassment based upon the following protected categories are prohibited and will not be tolerated; race, creed, color, national origin, nationality, ancestry, age, sex/gender (including pregnancy), marital status, civil union status, domestic partnership status, familial status, religion, affectional or sexual orientation, gender identity or expression, atypical hereditary cellular or blood trait, genetic information, liability for service in the Armed Forces of the United States, disability.

The policy also stated that "[i]t is a violation of this policy to engage in sexual (or gender based) harassment of any kind, including hostile work environment harassment, quid pro quo harassment, or same-sex harassment."

The DOC also promulgated a procedure for internal complaints alleging discrimination in the workplace. This procedure directed employees to

immediately report any suspected violations of the policy prohibiting discrimination in the workplace to any supervisory employee in the department. While the necessary forms were available to employees online, complaints did not need to be made in writing.

The supervisor was supposed to forward all complaints to the DOC's statewide Equal Employment Opportunity/Affirmative Action (EEO/AA) director. This director would determine if an investigation into the alleged harassment or discrimination was required. If it was, the EEO/AA director would then develop a report summarizing the investigation for submission to the DOC Commissioner for appropriate action.

Antonio Campos, an assistant warden, served as the liaison to the statewide EEO/AA office at NJSP. He testified at trial that he would typically forward any allegations to the EEO/AA director, though employees were free to forward such complaints themselves. Some complaints did not implicate these policies and, in those cases, Campos would advise employees how to handle conflicts with their colleagues.

A-3963-17T1

At trial,[2] plaintiff identified several incidents that she alleged were acts of gender-based discrimination, primarily involving a rumor that she was having an extramarital affair with a high-ranking prison official, S.D.,[3] beginning around the time of her transfer to her coveted Central Control position. This speculation arose after plaintiff posted a photograph on Facebook showing her dining with a man who resembled S.D., and increased after S.D. once greeted plaintiff by her first name in the presence of other employees.

Plaintiff and S.D. denied this affair, but the rumor continued to spread through their workplace. Plaintiff and S.D. heard the rumor repeated by numerous colleagues on a near-daily basis, including from plaintiff's sister who worked in another DOC facility. Officer Amy Foy testified she overheard several officers discussing the affair in the prison dining room. Multiple colleagues suggested that plaintiff received preferential treatment, including the Central Control assignment, because of the affair.

In June 2013, shortly after plaintiff's assignment to Central Control, Lieutenant Christopher Danielson told Sergeants Orlando Gil and Maurice

---

[2] The evidence plaintiff presented at trial expanded upon, but still largely mirrored, the facts she raised in opposing the DOC's pre-trial motion for summary judgment.

[3] We use initials to refer to this individual in order to protect his privacy.

Jackson that he did not "give a fuck who [plaintiff] fucked to get this job" and that he would "burn her." He made related comments to plaintiff in November 2013, when he referred to S.D. as her "boo."

On July 19, 2013, Lieutenant Jamie Vaux confronted S.D. regarding the alleged affair and threatened to tell S.D.'s wife.

At an unstated time in 2013 or 2014, plaintiff's immediate supervisor, Lieutenant Zsuzsanna Rogoshewski, told another lieutenant not to say anything private in front of plaintiff because she was "with" S.D. and "[s]he'll tell." Throughout 2014, Rogoshewski told various lieutenants that plaintiff was protected because she was having an affair with S.D..

On January 25, 2014, Rogoshewski called plaintiff an idiot, and temporarily reassigned her from her preferred role as blotter officer to the armory. Rogoshewski temporarily assigned a similarly-qualified male as blotter officer. Around this time, Rogoshewski told plaintiff she was not performing her work properly, and plaintiff reported this to her union representatives.

On March 10, 2014, Rogoshewski's fiancé, Lieutenant Patrick Miller, visited her in Central Control while he was supposed to be on duty elsewhere in the prison. The DOC began an investigation of Miller's conduct in leaving his

A-3963-17T1

post, referred to as the "Sanderson investigation," and plaintiff served as a witness on behalf of the DOC.

Four days later, Miller and Rogoshewski approached plaintiff in Central Control. Miller stated, "[m]e and [Rogoshewski] are going away on vacation to be unprofessional and inappropriate," and Rogoshewski said, "people need to mind their own fucking business," apparently in reference to plaintiff's role in the Sanderson investigation. Miller also stated he was taking a coffee break with Rogoshewski, and "anyone that cares to comment can shut the fuck up now." At trial, Miller denied making these statements. On March 16, 2014, Rogoshewski again told plaintiff that "people need to mind their own fucking business."

On March 21, 2014, Rogoshewski invited Vaux to Central Control and openly discussed plaintiff's alleged affair with S.D., stating "[t]hat's her over there, that's who's sleeping with the [high-ranking official]." Throughout March and April 2014, Rogoshewski refused to greet plaintiff when greeting other officers.

Testifying for the DOC, Lieutenant Shawn Davis asserted that Rogoshewski treated men and women equally. Lieutenant Michael Ptzaszenski claimed at trial that Rogoshewski was "rough around the edges," and was

7

demanding of everyone, whether male or female. However, Ptzaszenski admitted he never saw plaintiff and Rogoshewski interact in the workplace.

On April 14, 2014, Rogoshewski temporarily reassigned plaintiff from blotter officer to inmate gym and mail delivery. Similarly, at an unstated time in 2014, Miller temporarily moved plaintiff from Central Control to the West Compound. On April 25, 2014, Danielson told coworkers to be careful around plaintiff because she "might tell."

In July 2014, Officer Julie Houseworth threw papers at plaintiff, which plaintiff believed to be an act of gender discrimination because Houseworth "had an issue working with a lot of women" and because she had never seen Houseworth do this to a male. In mid-2014, Houseworth asked plaintiff if she planned to "blow" S.D. Houseworth later apologized for the remark.

On October 24, 2014, Houseworth kicked a chair or trash can and told plaintiff, "I have fucking had it with you," and then filed a report saying plaintiff had reached for her gun as a means of threatening Houseworth. Quiana Whitmore investigated the matter on behalf of the DOC, but testified she could not verify Houseworth's account of the incident. Houseworth did not testify at trial. Shortly thereafter, Jackson discouraged plaintiff from reporting Houseworth for making a false report in connection with the matter. Two

months later, Jackson told someone not to confuse him with plaintiff, saying "don't you ever call me that name again, that's an insult."

On January 4 or 5, 2015, plaintiff was injured when she was moving a food cart. Beginning in January 2015, plaintiff went on a medical leave of absence as a result of this injury.

Plaintiff complained to Campos, the EEO/AA liaison, orally regarding the rumored affair at least five times beginning in March or April 2014. She also relayed these complaints to S.D. and Ptzaszenski on unspecified dates. Specifically, plaintiff complained of sexual harassment and that "supervisors won't stop accusing me of sleeping with the [high-ranking official]," and emphasized that she did not want to work with Rogoshewski because she felt unsafe doing so. She also complained about the conduct by Miller, Houseworth, and Jackson, but did not report the incidents with Danielson or Vaux. Plaintiff did not explicitly use the term "gender discrimination" when making these complaints.

Campos told plaintiff to ignore the rumors regarding her involvement with S.D., and to "keep dodging the bullets," but he nonetheless questioned S.D. about the alleged affair. Significantly, Campos did not offer plaintiff the opportunity to complete any paperwork detailing her allegations and plaintiff

9

did not request to put these complaints in writing because she was embarrassed. Campos took no other action, and Leila Lawrence, the statewide EEO/AA director for the DOC, testified at trial that Campos did not relay any complaints from plaintiff. Ptzaszenski told plaintiff to ignore Rogoshewski or move to a different shift. During his testimony, Campos acknowledged that plaintiff came to him with complaints, but he felt that gossip and rumors did not "touch upon the [discrimination] policy" and, therefore, he expressed surprise that plaintiff expected him to pursue the matter.

Other employees, including Foy, had also complained of gender discrimination to Campos. At trial, Foy testified that while Campos offered her the opportunity to complete EEO documentation, she declined to do so.

Plaintiff testified that she was embarrassed, ashamed, and disgusted by the rumored affair with S.D.. She alleged she suffered anxiety and depression as a result of the gender discrimination. Plaintiff's sister, Jenna Allar, testified that plaintiff became withdrawn and would get angry more quickly after these incidents. Plaintiff also began to experience hair loss, stomach pains, lack of sleep, weight gain, diarrhea, and increased crying, causing her to use a number of sick days. She did not go out to socialize as often as she used to or perform household chores.

A-3963-17T1

On March 23, 2015, plaintiff filed a complaint against the DOC alleging: (1) a gender-based hostile work environment in violation of the LAD (count one); (2) retaliation under the LAD (count two); and (3) whistleblower retaliation under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 (count three). The DOC filed an answer, denying the allegations in plaintiff's complaint. In 2017, plaintiff stipulated to the dismissal of counts two and three of her complaint.[4]

Following the completion of discovery, the DOC unsuccessfully moved for summary judgment. The matter was then tried over multiple dates before a jury. At the close of plaintiff's case, the DOC moved for a directed verdict, alleging that she had not met the burden of proof for her claims, and the trial judge denied the motion. The judge also denied the DOC's subsequent motion for a directed verdict at the close of the trial. As previously noted, the jury found in favor of plaintiff. This appeal followed.

---

[4] On September 26, 2017, plaintiff filed a second lawsuit, Schiavone v. New Jersey Department of Corrections, Docket No. L-2099-17 (Schiavone II), involving allegations of discrimination which began in April 2016, unrelated to the claims in this matter. The court denied a motion in Schiavone II to consolidate these two matters, and plaintiff stipulated that she would restrict her damages in this matter to those claims which arose prior to Schiavone II.

A-3963-17T1

## II.

In Point I of its brief, the DOC asserts that the judge erred by denying its motion for summary judgment. The DOC argues that plaintiff failed to establish a prima facie case of a hostile work environment under the LAD and, even if she had, the DOC satisfied the elements of the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries v. Ellerth, 524 U.S. 742 (1998). We disagree.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Nicholas v. Mynster, 213 N.J. 463, 477-78 (2013). That standard is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

A-3963-17T1

When determining whether there is a genuine issue of material fact, the court must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. While the trial court's legal conclusions are owed no deference, Nicholas, 213 N.J. at 478, this court should affirm the judgment if it finds that the trial court's conclusions of law were correct. Henry v. New Jersey Dept. of Human Servs., 204 N.J. 320, 330 (2010).

In assessing hostile work environment based on gender discrimination claims, we employ the same analysis developed under the federal anti-discrimination laws in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). In order to avoid summary judgment in the employer's favor, the McDonnell Douglas test requires an employee to prove a prima facie case of discrimination. Victor v. State, 203 N.J. 383, 408 (2010). This burden has appropriately been described as "rather modest." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (quoting Marzano v. Compute Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

In Lehmann v. Toys 'R' Us, Inc., our Supreme Court delineated the standards of proof that are necessary in order to bring a discrimination claim

A-3963-17T1

premised on acts of sexual harassment. 132 N.J. 587, 603 (1993). To demonstrate a discriminatory hostile environment caused by sexual harassment, a plaintiff must show that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04.

Applying these standards to the facts available to the judge at the time the DOC sought summary judgment, we discern no basis to disturb the judge's denial of that motion.

In evaluating the DOC's motion, the judge considered the evidence of alleged gender discrimination presented in the motion record, including depositions and certifications, which discussed: the ongoing rumor about plaintiff's relationship with S.D.; Danielson's comment that he would "burn her"; Rogoshewski's persistent spreading of this rumor; Houseworth's hostility and lewd comment toward plaintiff; and Campos's failure to act in response to plaintiff's complaints. Giving plaintiff all the legitimate inferences from this evidence, we cannot agree with the DOC's assertion that the evidence was "so

14

one-sided" that plaintiff should have been barred from presenting her hostile work environment claim to the jury.

In so ruling, we reject the DOC's contention that there was insufficient evidence in the motion record to enable a jury to conclude that the harassment plaintiff identified would not have occurred but for her gender under the first prong of the Lehmann test. The requirement that a plaintiff demonstrate that the harassment would not have occurred but for her gender is the "defining element" of a hostile work environment claim. Herman v. Coastal Corp., 348 N.J. Super. 1, 20 (App. Div. 2002). "Common sense dictates that there is no LAD violation if the [employer's] conduct would have occurred regardless of the plaintiff's [protected status]." Lehmann, 132 N.J. at 604. Thus, under the first prong of the test, a plaintiff raising a claim of hostile work environment must show that "it is more likely than not" that the complained-of conduct occurred because of his or her protected status. Id. at 605.

Contrary to the DOC's argument on this point, rumors of sexual relationships may satisfy the first prong of the test set forth in Lehmann. For example, in Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 261-63 (App. Div. 1996), an employee of the defendant frequently told various colleagues that the female plaintiff was having affairs with high-ranking employees,

15                                                                          A-3963-17T1

specifically that she was "doing" medical residents and "sleeping with someone." The employee made other statements, including that the plaintiff was "a woman and a pain in my ass" and "being emotional because of PMS." Ibid. The court found that this employee's comments, including those about the affair, were facially sex-related and satisfied the "but-for" portion of the test. Id. at 270.

In addition, courts have held that rumors of sexual affairs with superiors in the workplace can constitute sex-based harassment of a woman, even though the participants in the alleged affair are, as here, both male and female. For example, in Spain v. Gallegos, 26 F.3d 439 (3d Cir. 1994), a hostile work environment case involving a false rumor that a female employee was having an affair with her male supervisor, the court reversed a trial court's grant of summary judgment and held that

> . . . the crux of the rumors and their impact upon Spain is that Spain, a female, subordinate employee, had a sexual relationship with her male superior. Unfortunately, traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior stubbornly persist in our society. Because we are cognizant that these stereotypes may cause superiors and co-workers to treat women in the workplace differently from men, we find that a reasonable jury could conclude that Spain suffered the effects she alleges because she was a woman.

16

[Id. at 448.]

The Spain court further held that such a rumor would not have the same impact on the male supervisor:

> . . . while it is true that the rumors also implicated [the male supervisor], the rumors did not suggest that his involvement in the alleged relationship had brought him additional power in the workplace over his fellow employees, and the employees had no reason for resenting him in the way they did Spain. Accordingly, he did not have to endure a hostile working environment brought about due to his sex.

[Ibid.]

Here, the record contained sufficient evidence to show that the harassing conduct exhibited by plaintiff's coworkers would not have occurred but for her gender. As the judge found, a female officer would endure unique implications because of the rumored affair which a male counterpart would not. The record supported the judge's observations that such rumors might suggest that she received the desirable Central Control assignment because of the relationship, and that such a determination should be made by the jury. For example, Danielson's comment that he did not care "who [plaintiff] fucked to get this job" indicates that the rumor was both a commentary on plaintiff's morals and suggested that she did not earn her desirable assignment. Therefore, the DOC's contention must be rejected.

17

The DOC next argues that plaintiff presented insufficient evidence under the second prong of the Lehmann test that the alleged harassment was severe or pervasive enough to make a reasonable woman believe that the conditions of her employment were altered and the working environment was hostile or abusive. This argument also lacks merit.

As we recently stated in Dickson v. Community Bus Lines, Inc.:

> "Severity and workplace hostility are measured by surrounding circumstances." Taylor [v. Metzger], 152 N.J. [490, 506 (1998)]. In assessing hostile work environment claims, "all the circumstances" must be looked at "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003) (quoting Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 19-20 (2002)).

> [458 N.J. Super. 522, 534  (App. Div. 2019).]

In denying the DOC's motion for summary judgment, the judge found that the rumored affair between plaintiff and S.D. was "of a sufficient nature and really in terms of it's being perpetuated, is, -- it's almost a continuing violation, that it's sufficient for a rational fact finder to determine whether or not a sexually hostile work environment was created."  Further, the rumored affair "made the

A-3963-17T1

rounds" over several months and further circulated within plaintiff's work site, as well as to other facilities operated by the DOC.

The judge appropriately cited Taylor v. Metzger, 152 N.J. 490 (1998), to emphasize that even one single incident could be actionable, and stated that at least one superior lieutenant was involved in perpetuating the rumor. The judge concluded that because the rumor was widely disseminated in the prison, a rational fact finder could determine it was severe or pervasive enough to make a reasonable woman believe that the conditions of her employment were altered and the working environment was hostile or abusive. Therefore, the judge properly denied the DOC's summary judgment motion.

The DOC next argues that even if the elements of gender-based hostile work environment existed, it satisfied the elements of the Faragher and Ellerth affirmative defense, as made applicable in New Jersey under Aguas v. State of New Jersey, 220 N.J. 494 (2015). We disagree.

Employers have a duty to take effective measures to stop co-employee harassment when the employer knows or has reason to know that such harassment is taking place. Blakey v. Continental Airlines, Inc., 164 N.J. 38, 62 (2000). In Aguas, the Supreme Court addressed whether an employer can be liable for an alleged hostile work environment where the employer did not

19

effectuate an adverse employment action against the plaintiff. 200 N.J. at 494. The court held the affirmative defense established in Faragher, 524 U.S. at 775 and Ellerth, 524 U.S. at 742, to be applicable to cases in New Jersey. Aguas, 200 N.J. at 523-24. Under Faragher and Ellerth, an employer is entitled to summary judgment if it (1) "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Aguas, 220 N.J. at 524 (citing Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 765).

This affirmative defense "provides no benefit to . . . employers who fail to implement effective anti-harassment policies, and employers whose policies exist in name only." Aguas, 220 N.J. at 522-23. An employer that implements an ineffective anti-harassment policy, or fails to enforce its policy, may not assert the affirmative defense. Id. at 523.

Here, the DOC did not demonstrate that it was entitled to rely upon this affirmative defense as a means of defeating plaintiff's opposition to summary judgment. Under the first prong of the Faragher and Ellerth test, the motion record plainly demonstrated that the DOC failed to use reasonable care to prevent or correct the alleged harassing behavior. Despite the policy's

requirements, and plaintiff's multiple complaints to her supervisors and to Campos, her allegations were not forwarded to the DOC's statewide EEO/AA officer, Lawrence, for further investigation. Campos merely directed plaintiff to try to ignore the rumors. Despite her complaints as early as March or April 2014, the motion record reflected that the harassment of plaintiff by multiple superior officers continued until plaintiff's leave of absence began in January 2015. Thus, the DOC's policy was utterly ineffective.

Under the second prong of the test, nothing in the motion record revealed that plaintiff unreasonably failed to take advantage of the opportunities provided by the DOC to correct the harassment. To the contrary, plaintiff complained of this conduct to various prison officials repeatedly as early as March or April 2014. While she did not label this conduct gender discrimination, she nonetheless indicated that it pertained to her alleged romantic relationship with her superior, S.D., and the prison officials should have recognized that these complaints implicated possible gender discrimination. Therefore, the judge correctly rejected DOC's contention that it was entitled to assert the Faragher and Ellerth defense.

III.

21

For many of the same reasons discussed above, we also reject the DOC's assertion in Point II of its brief that the judge erred by denying its motions for a directed verdict, made both at the end of plaintiff's case and at the conclusion of the trial.

Under Rule 4:40-1, "[a] motion for judgment . . . may be made by a party . . . at the close of all the evidence offered by an opponent." The standard of review is the same as that for a motion for Rule 4:37-2(b), which permits a party to seek an involuntary dismissal after "the presentation of the evidence on all matters" at the trial. In deciding the motion, the court "must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence]." Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 572 (2010) (alteration in original) (quoting Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998)). If reasonable minds could reach different conclusions, the motion must be denied. Rena, Inc. v. Brien, 310 N.J. Super. 304, 311 (App. Div. 1998). If the evidence is so one-sided, however, that one party must prevail as a matter of law, then a directed verdict is appropriate. Frugis v. Bracigliano, 177 N.J. 250, 269 (2003).

Applying these standards, we detect no error in the denial of the DOC's motions for directed verdicts. As noted in our discussion of the summary judgment motion, there was ample evidence that plaintiff would not have been harassed but for her gender, and the constant harassment she suffered was clearly "severe or pervasive enough to make a . . . reasonable woman believe that . . . the conditions of employment are altered and the working environment is hostile or abusive." Lehmann, 132 N.J. at 603-04. Therefore, the judge correctly denied the DOC's motions.

IV.

Finally, the DOC argues in Point III of its brief that the judge made several evidentiary errors that require reversal. This contention also lacks merit.

Our standard of review of a trial court's decisions on evidentiary questions is well settled. "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). Applying

23

this standard, none of the allegations raised by the DOC on this point require our intervention.

The DOC first argues that the judge erred by barring any references by the parties to plaintiff's assertion in her complaint that she was the victim of retaliation due to her involvement in the Sanderson investigation. The DOC asserts that this ruling prevented it from arguing to the jury that the harassment plaintiff suffered was the result of retaliation for reporting Miller's misconduct rather than because of her gender.

However, plaintiff voluntarily dismissed the retaliation count of her complaint prior to trial, and the DOC filed a successful in limine motion to exclude evidence of certain dismissed retaliatory acts because admitting them would be confusing to the jury and unduly prejudicial. Under these circumstances, the DOC's change of heart at trial and its attempts thereafter to introduce the retaliation claims were clearly barred by the judicial estoppel doctrine, which operates to bar a party from asserting a position contrary to and inconsistent with one previously asserted. McCurrie v. Town of Kearny, 174 N.J. 523, 533-34 (2002).

The DOC next argues that the judge erred by excluding evidence of plaintiff's subsequent complaints against other employees in Schiavone II,

which prevented the defense from cross-examining plaintiff regarding her assertion that making a complaint about the gender-based harassment in this matter was futile. However, the Schiavone II action was entirely separate from the case at hand, and plaintiff stipulated to limit her damages here to the period before the claims in her second matter arose. Thus, the later allegations were simply not relevant in this matter.

The DOC also claims that the judge should have barred Foy from testifying because her testimony was hearsay, and was also inadmissible under N.J.R.E. 404(b) because it concerned Campos's "prior bad acts." These arguments lack merit.

Contrary to the DOC's contention, Foy's testimony about the rumors she heard being spread about plaintiff was not hearsay. This is so because it was not offered to prove the truth of the matter asserted, namely, that plaintiff and S.D. were having an affair. Instead, the testimony was presented to establish that the rumor, whether true or not, was circulating and openly discussed at NJSP.

The DOC also objected to Foy's testimony by claiming that any attempt by plaintiff to portray the futility of complaining to Campos was an attempt to

demonstrate his "prior bad acts" in violation of N.J.R.E. 404(b). However, the DOC has misinterpreted Foy's testimony on this point.

Foy testified that after she informally complained to Campos in 2015 or 2016 about gender-based harassment, Campos gave her a packet of papers to fill out in order to enter a formal complaint. Foy stated she declined to do so because it was easier to "just deal with it" on her own. This testimony clearly did not violate N.J.R.E. 404(b) because Foy's personal decision to forego filing a written complaint simply does not demonstrate any "bad act" on Campos's part.[5]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] As for the balance of any of the DOC's arguments not expressly mentioned above, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).